[L. A. No. 25444. In Bank. May 10, 1960.]

E. K. WOOD LUMBER COMPANY (a Corporation), Appellant, v. ROBERT C. HIGGINS et al., Defendants; DEEP WELL COLONY ESTATES, INCORPORATED (a Corporation), Respondent.

Brown & Brown, Howard B. Brown and Gerald S. Barton for Appellant.

Vincent C. Hickson, Holbrook, Tarr & O'Neill and Francis H. O'Neill for Respondent.

McCOMB, J.—After trial before the court without a jury, in an action to foreclose a mechanic's lien, plaintiff appeals from that portion of the judgment which was in favor of defendant Deep Well Colony Estates, Incorporated (hereinafter referred to as "Deep Well Colony Estates").

Defendant Higgins was engaged as a general contractor in Palm Springs, California. For several years, as a contractor he had purchased, on an "open book account," lumber from plaintiff lumber company for use on various jobs. From time to time he made payments on this "open book account," and plaintiff had never filed a mechanic's lien for a deficiency in payment upon completion of any of his jobs.

In November 1955 Higgins contracted with defendant Deep Well Colony Estates to construct a house for in excess of

$56,265 on property owned by Deep Well Colony Estates called the "Dart" property.

In performance of this contract, between November 23, 1955, and May 25, 1956, Higgins purchased lumber from plaintiff for use in the construction of the house, at an agreed reasonable value of $7,196.19.

On February 27, 1956, from funds paid by Deep Well Colony Estates, Higgins paid plaintiff $1,975.66, leaving a balance due of $5,220.53.

Early in May 1956 Deep Well Colony Estates requested an accounting from Higgins with respect to advances made for payment of labor and materials.

About May 10, 1956, Higgins met with Charles B. Howe, controller of plaintiff, and Wilbur Place, its employee, to arrange settlement of his account and to make certain that no mechanic's lien would be filed on this job. At such time Higgins was indebted on his general open account to plaintiff in the amount of $9,487.06, of which $5,220.53 was on account of the house he was constructing for Deep Well Colony Estates. Higgins advised plaintiff that he could not pay his entire obligation and that he did not wish a lien placed upon the house he was building for Deep Well Colony Estates, and he offered to give a promissory note to be paid when he sold another house in which he had an interest. One of plaintiff's officers visited the house, which Higgins stated he had up for sale. Thereafter, an officer of plaintiff stated to Higgins that the note "would take care of it," that is, would be a substitute for the mechanic's lien. Thereupon Higgins' attorney transmitted a note to plaintiff in the sum of $9,487.06, accompanied by a letter which read in part: "I am enclosing a promissory note *in the payment* of $9,487.06, with interest at the rate of 5%, payable on or before one year from its date or on sale of Mr. Higgins' home whichever occurs first." (Italics added.)

Some six or seven weeks later Higgins learned that a mechanic's lien had been filed by plaintiff on the Deep Well Colony Estates house which he had constructed. Subsequently plaintiff instituted the present suit to foreclose on the mechanic's lien and to collect on the note which Higgins had given it.

The trial court found that plaintiff had accepted Higgins' note in payment of, and in satisfaction of, the open account which he owed plaintiff and in lieu of plaintiff's right to claim a mechanic's lien against the property of Deep Well

Colony Estates and by so accepting the note plaintiff waived its right to claim a mechanic's lien.

This is the sole question necessary for us to determine: *Was there substantial evidence to sustain the trial court's findings that plaintiff (a) accepted Higgins' promissory note in payment of the obligation which he owed plaintiff and (b) waived its right to claim a lien against the property of Deep Well Colony Estates?*

*Yes.* These rules are here applicable:

1. When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding. (*Primm* v. *Primm,* 46 Cal.2d 690, 693 [1] [299 P.2d 231].)*

2. An appellate court will accept and adhere to the interpretation of a contract adopted by the trier of fact and not substitute its own interpretation where parol evidence is introduced in aid of interpreting the contract and from such evidence conflicting inferences may be drawn. (*Estate of Rule,* 25 Cal.2d 1, 11 [4] [152 P.2d 1003, 155 A.L.R. 1319] ; *Faus* v. *Pacific Electric Ry. Co.,* 146 Cal.App.2d 370, 375 [1] [303 P.2d 814] [hearing denied by the Supreme Court] ; *Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367, 370 [1] [210 P.2d 757] [hearing denied by the Supreme Court].)

3. Waiver of mechanic's lien rights does not require a formal contract, but may be inferred from the circumstances and the conduct of the parties. (*Llewellyn Iron Works* v. *Reed,* 123 Cal.App. 607, 610 [1] [11 P.2d 657] [hearing denied by the Supreme Court] ; *cf. Kress* v. *Tooker-Jordan Corp.,* 103 Cal.App. 275, 287 [7] [284 P. 685].)

The record discloses that Higgins testified as follows: "A. Well, I told him I was unable to pay him at that time, and I said that I would be willing to give him a second trust deed on my house, which was in the neighborhood of a $70,000

---

*Mr. Justice Vallée, in *Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367 at 370 [210 P.2d 757] [hearing denied by the Supreme Court], apropos of this rule, pertinently said: "Andre Gide once observed: 'Everything has been said already; but as no one listens, we must always begin again.' With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. No one seems to listen."

house, and I took him up to my house. Q. Wait a minute. Was something more said before you went to the house? A. Yes, I told—— Q. Tell us everything that was said there as far as you can remember. A. *Well, I told him I didn't want any lien filed on the house.* Q. *What house?* A. *On the Dart house. That's the house in question.* Q. Yes. A. *And I wondered if there was some way we could work it out, so then I suggested that I give him a note on my house.* So then we went up to my house and looked at it,—and I had $30,000 in the house. Q. Was the house at that time for sale? A. Yes; it was. Q. What was the sale price? A. $79,000. Q. All right. Now, was there any conversation concerning the amount of your general account with the E. K. Wood Lumber Company? A. I just took their word for it—what they said I owed them. Q. Do you recall the amount? A. Just under $10,000. Q. Did I understand you correctly to say that you offered them a trust deed—second trust deed on your house? A. Yes, I did. Q. Or a note? A. Or a note. . . . Q. Now, after having visited at the house, and after having made the inspection, what, if anything, was said with reference to the acceptance of a note and—— A. At that time, Mr. Howe seemed to be in accordance with me. Q. Don't say that. Tell me what he said. A. *Well, he said he would take a note from me for the payment and I told him I would pay when my house was sold, or as soon as I could get funds.* Q. *Was anything further said concerning the matter of lien on the Dart job?* A. . . . *He said this would take care of it.* That is what I was after, to keep him from filing a lien. . . . Q. Then you had asked him—that was the reason you wanted to give the loan—the note—so no lien would be filed? A. Yes, sir. Q. *And he said that they would take the note which would take care of that matter?* A. *That's right; give the note.* . . . Q. Now, after Mr. Howe and Mr. Place left the home, what did you next do? A. I went to my attorney and had him draw up a promissory note, and—— Q. After it was drawn, what did you do? A. I signed it. . . . Q. Is this the note that you signed on or about the date that it bears, May 10; is that correct? A. Yes, sir, it is. . . . Q. In other words, after your friend advised you of the filing of the lien, what did you next do? A. I phoned Mr. Howe at his office in Whittier. Q. And did Mr. Howe answer the telephone? Did you recognize his voice? A. I placed a person to person call to him. Q. And you did talk to him? A. Yes, I did. Q. Tell me the conversation. A. Well, I asked him why he filed the lien. *I said, 'I thought the promissory*

*note was so you wouldn't file.'* I said, 'You've got me in real hot water.' I said, 'Why did you file the lien?' He said, *'Well, I discussed it and decided it wasn't sound business.'* They could not accept the loan. Q. In other words,—*but they never so advised you?* A. No, they didn't.'' (Italics added.)

Plaintiff's general manager admitted receiving the note and the letter which accompanied it. He testified as follows: ''Q. And this note of May 10, 1956, when was the first time you ever saw it? A. Oh, I don't know. Q. Shortly after May 10? A. Yes, I think when it was being executed I knew of the existence of it. Q. And the note, I think, was delivered to you by, I think, Mr. Merrill Brown, by way of letter? A. Well, it was not delivered to me, sir. Q. It came to the— A. Came to the E. K. Wood Lumber Company. Q. And to your attention? A. *I saw it.''* (Italics added.)

Plaintiff's controller testified thus: ''Q. Did Mr. Higgins say anything at all in the conversation about not wanting a lien against the Dart job? A. Well, as I recall, he did. He didn't want a lien. *He wanted to give us something that would take the place of a lien.* Q. That was his object—to get away from any lien? A. That's right. . . . Q. Directing your attention to the first line of Plaintiff's number 4, 'I am enclosing a promissory note in payment of $9,487.06, with interest at the rate of five per cent, payable on or before one year . . .' and so forth and so on, *did you read the words 'in payment' when you received this letter?* A. *I presume I did.* . . . Q. You didn't send the note back or write another letter? A. I don't remember writing a letter. I don't know—I may have. . . . Q. Well, at least you made no objection? A. Not that I recall. Q. *No objections to the statements contained in that letter?* A. *No.''* (Italics added.)

 Applying the foregoing rules to the evidence disclosed by the record, it is apparent that there was substantial evidence, together with inferences which could properly be drawn therefrom, to support the questioned findings of the trial court that the promissory note of May 10, 1956, was given and accepted in full satisfaction of the prior obligation and expressly to extinguish plaintiff's mechanic's lien rights. Higgins testified that he offered the note for such purpose. One of plaintiff's witnesses testified that Higgins had explained he did not have title to the house, part of the proceeds from the expected sale of which he planned to use in payment of the note. Obviously Higgins could not give a deed of trust on property to which he did not have title. This testimony is

consonant with the conclusion that the note expressed the agreement of the parties that it would be paid within a year or if the house in which Higgins had an interest were sold sooner, at the time of sale.

It is clear that the purpose of the giving of the note was to secure a waiver of the right to impose a mechanic's lien and that the trial court was justified in finding, as it did, that under the circumstances here presented retention of the note by plaintiff manifested its acceptance as payment of Higgins' obligation and as a waiver of the right to file a mechanic's lien.

In view of our conclusions, it is unnecessary to discuss other arguments presented by counsel.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., Dooling, J. pro tem.,* and Duniway, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.