[Civ. No. 24643. Second Dist., Div. One. Dec. 9, 1960.]

TRANSMIX CORPORATION (a Corporation), Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

E. D. Yeomans and Walt A. Steiger for Appellants.

Turcotte & Goldsmith and Jack O. Goldsmith for Respondent.

FOURT, J.—This is an appeal from a judgment in favor of plaintiff with reference to certain claims arising out of overcharges on shipments of cement.

The plaintiff brought the action to collect from the railroad companies freight overcharges on 217 carload shipments of cement, consigned and delivered to plaintiff by defendants at Los Angeles. Two hundred and fourteen (214) cars originated at Permanente, which is located on a branch line of Southern Pacific Company at a point west of Palo Alto, and three cars originated at Kentucky House, which is located in or near Calaveras County. Defendant carriers collected freight charges based upon a rate of 31 cents per 100 pounds

from Permanente and 35 cents per 100 pounds from Kentucky House in the total amount of $120,997.31. Plaintiff thereafter contended that the proper charge to have been applied was $72,619.39 and that therefore it was overcharged $48,-377.92 and was entitled to such amount plus interest until paid. The claim was denied by the railroads and this action followed. The plaintiff asserted that the published through rate assessed by defendants was inapplicable, that there was an excess charge on each of the shipments and that there was a lower combination rate which was in effect during all of the times in question.

An extensive stipulation of facts was filed (which became a part of the pretrial conference order) and thorough and complete trial briefs were submitted to the trial judge. The stipulation, among other things, contained the basic freight tariff, referred to as Number 88-T, issued January 31, 1951, and effective March 24, 1951, and supplements as follows: Supplement Number 36 issued March 10, 1954, and effective April 14, 1954; Supplement Number 37 issued April 6, 1954, and effective May 13, 1954; Supplement Number 46 issued June 3, 1955, and effective July 9, 1955; Supplement Number 66 issued October 4, 1956, and effective November 10, 1956; Supplement Number 67 issued October 26, 1956, and effective December 3, 1956.

Two hundred and fourteen (214) carloads of the shipment were from Permanente to Los Angeles and were shipped between April 25, 1954, and October 4, 1955. Three carloads of the shipment originated at Kentucky House and were delivered at Los Angeles, and the shipments were made between April 15, 1955 and May 4, 1955. It was agreed in effect that if the plaintiff's contentions were correct with reference to the Permanente shipments, judgment would necessarily follow likewise for the Kentucky House shipments. In each instance the shipments were transported from the point of origin to Los Angeles solely by Southern Pacific Company which then turned over the cars to Union Pacific at Los Angeles for the purpose of switching them to the plaintiff's place of business.

What is the proper rate from Palo Alto to Los Angeles is the real question in the action. The 15 percent surcharge and the switching charges are actually not in dispute in this case.

Plaintiff contended in part that it was entitled to the particular rate it sought under the Intermediate Rate Rule

which was contained in the basic Tariff, Number 88-T. That rule reads in pertinent part as follows:

"COMMODITY RATES APPLICABLE FROM (OR TO) INTERMEDIATE POINTS (Applies on Interstate Traffic only).

"Except as otherwise specifically provided in connection with individual rates, the rates named herein will apply from (or to) directly intermediate points on the same line or route. . . ."

That rule is contained in the tariff in order to protect against violations of the long and short haul clauses contained in section 460 of the Public Utilities Code and article XII, section 21, California Constitution.

The through rate from Permanente and Kentucky House to Los Angeles in Item 1735-C of Supplement Number 36 was stated to be 31 cents and 35 cents per 100 pounds, respectively. Defendants assert that such rates were the effective rates for the shipments in question.

Plaintiff claimed that there was a published rate of 11 cents per 100 pounds from Redwood City to El Centro. Redwood City is north and west of Palo Alto on the lines of the Southern Pacific. El Centro is in Imperial County in the southeast part of the state and is located on the lines of the Southern Pacific. Plaintiff asserts that if the 11-cent rate applies from Redwood City to El Centro that it necessarily then applies from Palo Alto to Los Angeles; Palo Alto being intermediate from Redwood City and Los Angeles, and Los Angeles intermediate to El Centro. In other words, Palo Alto and Los Angeles are both intermediate between Redwood City and El Centro.

The tariffs provide for a combination rate and prevail over through rates whenever they result in a lower charge. The tariff (88-T) recites as follows:

"Item 245—RATES WITHIN CALIFORNIA (Applies on California Intrastate Traffic only).

"Whenever a Class Rate and a Commodity Rate are named between specified points, the lower of such rates is the lawful rate, unless some combination of Class Rates, or of Commodity Rates, or of class and Commodity Rates makes a lower through rate."

This item was in effect during all of the time the shipments were made. Plaintiff arrived at the rate it contends for by taking the published 7½-cent rate from Permanente to Palo Alto and adding thereto the intermediate 11-cent rate, making a total of 18½ cents per 100 pounds as distinguished from

the through rate of 31 cents from Permanente to Los Angeles, contended for by the railroads.

In the basic tariff (88-T) in Item 475 it is set forth that the rate per 100 pounds from "3896 Redwood City" to "8 El Cerrito" is 11 cents. It is also stated at the top of the page where such item is listed that "The number prefixed to a station name is its Index Number."

In Supplement Number 37 to Tariff 88-T the same phraseology with reference to index numbers is contained at the top of the page and it is further set forth in Item 475A, which cancels Item 475, that the rate per 100 pounds from "3896 Redwood City" to "8 El Centro" is 11 cents.

In Supplement Number 46 to Tariff 88-T the same wording with reference to index numbers is contained at the top of the page as heretofore indicated in Supplement Number 37. In item 475A mentioned therein as cancelling item 475 the rate per 100 pounds from "3896 Redwood City" to "8 El Centro" is 11 cents.

Supplement Number 66 to 88-T sets forth substantially the same matters and figures as are set forth in Supplements Numbers 37 and 46.

Supplement Number 67 to 88-T duplicates substantially the wording contained in the original tariff (88-T) and sets forth that for item 475A from "3896 Redwood City" to "8 El Cerrito" the rate per 100 pounds is 11 cents.

It is admitted that Supplements numbered 37, 46 and 66 provided for an 11-cent rate from Redwood City to some point of destination; the sole question of any consequence in the action is what destination is prescribed by the tariffs, El Cerrito or El Centro. It is to be noted that El Centro appeared in the tariff items in the supplements under question from May 13, 1954 to December 3, 1956; or a period in excess of two and one-half years.

Item Number 2905 of the basic tariff (88-T) provided an authorized route from Redwood City, and also from Permanente to each and every station in California on the lines of Southern Pacific Company, including El Centro. The shipment of plaintiff in question moved solely over the Southern Pacific Company railroad from Permanente to Los Angeles.

The plaintiff and the Southern Pacific Railroad Company each had one witness, namely an expert on rates. It was stipulated that each witness was an expert in the field and a rate expert was defined to be:

". . . one who is thoroughly conversant with the theory

and practice of rate making; *who is well qualified in the art of rendering opinions with respect to compilation and interpretation of tariffs.* He is one who is qualified to quote rates, upon request, from freight railroad tariffs. That a rate expert is one who is qualified and has knowledge with respect to the history of rate making and the compilation of those rates into tariffs.'' (Emphasis added.)

The testimony of the experts was in sharp conflict and many conflicting inferences could be drawn from their testimony.

The trial judge found in favor of the plaintiff holding in effect that the 11-cent rate was in effect from Redwood City to El Centro during the period in question. The amount of the judgment is not in question as the parties had previously stipulated that if the court found for the plaintiff the amount should be the amount as awarded plus interest.

The court further found substantially the same with reference to the shipments from Kentucky House.

 The general rule has been stated repeatedly to the effect that where the evidence is in conflict this court will not disturb the findings of the trial court. Every presumption is in favor of the judgment and we must, in this case, consider the evidence in the light most favorable to the plaintiff and give it the benefit of every reasonable inference and resolve the conflicts in favor of the judgment. (See *Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Richter* v. *Walker*, 36 Cal.2d 634, 640 [226 P.2d 593]; *Newman* v. *Albert*, 170 Cal.App.2d 678, 683 [339 P.2d 588]; *Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210 P.2d 757]; *E. K. Wood Lumber Co.* v. *Higgins*, 54 Cal. 2d 91, 94 [4 Cal.Rptr. 523, 351 P.2d 795].)

The evidence in favor of the plaintiff was substantial, clear and convincing. The main problem in the trial court was to interpret and construe the tariffs. The tariffs themselves were introduced into evidence and as such they constituted substantial evidence. Each of the expert witnesses gave his views of the tariffs, how he thought the tariffs should be interpreted, what he thought the tariffs meant and each gave his reasons for his particular viewpoint. The judge obviously accepted the views of the plaintiff's expert witness and rejected most of the views of the defendants'.

The issue here as indicated was the interpretation of the several writings, namely the tariffs, there being at least two very different meanings to be applied to what was therein

set forth. ▮ A tariff is in the nature of a contract between the shipper and the carrier. (*A. E. West Petroleum Co.* v. *Atchison, T. & S. F. Ry. Co.,* 212 F.2d 812, 816.) Each of the parties in this case apparently thought that it was necessary to produce an expert witness to aid the court in arriving at a proper interpretation of the documents. In other words, the tariffs were ambiguous and technical and needed explanation and interpretation. If the interpretation and construction of the tariffs adopted by the trial court is reasonable, then under the circumstances, this court should affirm the determination made by the trial court. (See *Schmidt* v. *Macco Construction Co.,* 119 Cal.App.2d 717, 734 [260 P.2d 230] ; *Estate of Rule,* 25 Cal.2d 1, 10-11 [152 P.2d 1003] ; *Universal Sales Corp., Ltd.* v. *California Press Mfg. Co.,* 20 Cal.2d 751, 772 [128 P.2d 665] ; *Quader-Kino A.G.* v. *Nebenzal,* 35 Cal.2d 287, 294 [217 P.2d 650] ; *Overton* v. *Vita-Food Corp., supra,* 94 Cal.App.2d 367, 370; *E. K. Wood Lumber Co.* v. *Higgins, supra,* 54 Cal.2d 91, 94; *F. C. Tomlinson* v. *Wander Seed & Bulb Co.,* 177 Cal.App.2d 462, 469 [2 Cal.Rptr. 310] ; *Faus* v. *Pacific Electric Railway Co.,* 146 Cal.App.2d 370, 375 [303 P.2d 814].)

The judge had the opportunity to see how the respective witnesses considered each question; their hesitancy, if any; their reactions to cross-examination; their general demeanor, and all of the matters and things witnessed at a trial. The judge concluded that the witness of the plaintiff was correct in his views and testimony. To say the least, some of the testimony of the expert for the railroad was unrealistic with reference to the obligations of a shipper in making a shipment. The net effect in substance of a part of his testimony was that the shipper should not have relied upon the tariff schedule of the railroad as printed and that the shipper should have known that a mistake had been made in the printing of the rates and therefore it (the shipper) should pay what the railroad thought or intended the rate should be and not what was actually published.

The appellants contend that the basic through one-factor rate, was the proper rate and the court erred as a matter of law in refusing to apply such rate (i.e. erred in determining that the lawful, applicable rate was the combination, two-factor rate).

Public Utilities Code, sections 494 and 532, provide as follows:

''Section 494—Charging rates differing from filed schedules :

Refunds or remissions: Discrimination in extending privileges or facilities.

"No common carrier shall charge, demand, collect, or receive a different compensation for the transportation of persons or property, or for any service in connection therewith, than the applicable rates, fares, and charges specified in its schedules filed and in effect at the time. . . ."

"Section 532—Charging different rates than specified in schedules forbidden: . . .

". . . no public utility shall charge, or receive a different compensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates, tolls, rentals, and charges applicable thereto as specified in its schedules on file and in effect at the time, . . ." (Deering's California Code.)

The statutes set forth have their origin in the Interstate Commerce Act (49 U.S.C.A.). California follows the decisions of the courts of other states or of the federal courts in construing a statutory enactment adopted from such other state or one modeled after the federal statute.

The pretrial stipulation provides, among other things, the following:

"Item 245 of Pacific Southcoast Freight Bureau Tariff No. 88-T authorizes the application of a combination of rates when such combination results in a lower rate than the through published rate, and said Item is expressly restricted to apply only on California intrastate traffic. Said Item was in effect during the entire period the subject shipments moved. . . ."

The defendants state that it was an error in printing to spell out El Centro rather than El Cerrito and that it was not intended to have the tariffs read as they did read. Even if it be assumed that it was an error in printing, under the circumstances it would seem to be of little help to the appellants. Tariffs are strictly construed and no understanding or misunderstanding of either or both of the parties is enough to change the rule. The carrier cannot by contract, conduct, estoppel, waiver, directly or indirectly increase or decrease the rate as published in the tariff of the carrier until the published tariff itself is changed.

In *New York, N. H. & H. R. Co.* v. *York & Whitney Co.*, 215 Mass. 36, 40 [102 N.E. 366] (writ of error dismissed in 239 U.S. 631 [36 S.Ct. 166, 60 L.Ed. 477]), and cited with

approval in *Pittsburgh, C. C. & St. L. R. Co.* v. *Fink,* 250 U.S. 577, 583 [40 S.Ct. 27, 63 L.Ed. 1151], it is said:

". . . The reason why there must be *inflexibility* in the enforcement of the published rate *against all and every suggestion for relaxation* rests upon the practical impossibility otherwise of maintaining equality between all shippers without preferential privileges of any sort. The rate when published becomes established by law. It can be varied only by law, and not by act of the parties." (Emphasis added.)

In *Pittsburgh, C. C. & St. L. R. Co.* v. *Fink, supra,* 250 U.S. 577, 582 it is stated: ". . . but instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation." See also *Louisville & Nashville R. R. Co.* v. *Maxwell,* 237 U.S. 94, 97 [35 S. Ct. 494, 59 L.Ed. 853, L.R.A. 1915E 665], where it is set forth:

"Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. *This rule is undeniably strict and it obviously may work hardship in some cases,* but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." (Emphasis added.) (See, *Standard Rice Co., Inc.* v. *Southern Pacific Co.,* 139 F.2d 93, 95; *Button* v. *Atchison, T. & S. F. Ry. Co.,* 1 F.2d 709, 712; *Texas & Pacific Railway Co.* v. *Mugg & Dryden,* 202 U.S. 242 [26 S.Ct. 628, 50 L.Ed. 1011]; *National Carloading Corp.* v. *Atchison, T. & S. F. Ry. Co.,* 150 F.2d 210, 212; *Fort Worth & D. C. Ry. Co.* v. *F. Burkart Mfg. Co.,* 56 F.Supp. 159, 160; *F. Burkhart Mfg. Co.* v. *Fort Worth & D. C. Ry. Co.,* 149 F.2d 909, 910; *Gardner* v. *Rich Mfg. Co.,* 68 Cal.App.2d 725, 730-731 [158 P.2d 23]; *Butler* v. *Bell Oil & Refining Co.,* 70 Cal.App.2d 728 [161 P.2d 559].)

We think that there is no merit to the appellants' assertion that the rate must be what they intended it to be rather than what was actually published. In the trial memorandum of defendants it was stated: "Reducing the problem to the very simplest terms: If a railroad intends to publish a rate of 90 cents cwt., but it comes off the printing press as .09

cents cwt., *there is no question that* .09 cents cwt. is the legally applicable rate." The expert of the railroad testified to substantially the same thing. Appellants argue that if the error is in the naming of a point of destination rather than a figure in the tariff then a different rate should apply.

There are many cases holding in effect that typographical errors in tariffs do not necessarily mean that the carrier can charge the rate which it intended rather than the erroneously published rate. (*J. C. Penny Co., Inc.* v. *Baltimore and Ohio R. R. Co.*, 243 I.C.C. 36, 37-40; *Stein Co.* v. *Gulf C. & S. F. Ry. Co.*, 153 I.C.C. 185, 186; *D. E. Ryan Co.* v. *Missouri Pac. R. Co.*, 177 I.C.C. 348, 349.)

In *Seaboard By-Product Coke Co.* v. *Director General*, 62 I.C.C. 317, there was an error in the publishing of the name of a point. There the carrier intended for the tariff to show the station of Fresh Pond Junction, Long Island. Through error the tariff showed Fresh Pond Junction, New Jersey. The commission held that the tariff must be construed as it was printed regardless of any error, saying at page 329 among other things: ". . . [T]he intention of the tariff framers is not controlling." The court in *Magnolia Provision Co.* v. *Beaumont, S. L. & W. Ry. Co.*, 20 F.2d 384, 385 said:

"I agree with the carriers that the evidence in the case, both the oral testimony and the structure of the tariff itself, shows plainly that the 23-cent rate was not originally drafted for the bracket 3405; but I agree with plaintiffs that *the question of what the carriers intended abstractly is wholly immaterial,* and that none of this evidence is relevant to the issue here joined, because in law it is an irrebut[t]able presumption that a rate filed with the Commission and published is the lawful rate, and the carrier cannot be heard to dispute the rate by such claim. (Emphasis added.)

". . . . . . . . . . . .

"So earnest has been the insistence of counsel for the railroad companies, and so able and diligent their briefing, that I have labored mightily to see the matter as they have presented it. *But I have come back at the conclusion of the inquiry to the point whereat I began, that a rate filed and published is the only rate which the carrier may exact, and the only rate which the shipper may pay."* (Emphasis added.)

In *Beaumont, Sour Lake & Western Ry. Co.,* v. *Magnolia Provision Co.,* 26 F.2d 72, 73 (cert. denied, 278 U.S. 620 [49 S.Ct. 23, 73 L.Ed. 542]) it is set forth:

"The 23-cent rate was published in the tariff schedules by

mistake. The carriers intended to continue in force the pre-existing rate of 70 cents. . . .

"Appellants liken a published tariff rate to a contract between the carrier and the shipper in support of the argument that a mistake can be corrected so as to give effect to the intention of the parties. A shipper has no voice in the fixing of rates, but must pay the published rate, and can only make claim of reparation on account of a rate that is unjust or discriminatory. The Supreme Court has held that a published tariff rate is to be treated as though it were a statute binding upon both the carrier and the shipper."

Furthermore, there was little, if any, proof upon the part of the railroad as to how El Centro came to appear as it did in the tariff. Their expert stated he had had nothing to do with it, no witness was called from the company which actually printed the tariff and no one was called from the company which prepared the tariff for the printer. The station name was spelled correctly, the number of letters in El Centro is different from the number of letters in El Cerrito. The printing appeared in three supplements, and as heretofore stated appeared for more than two and one-half years. Other changes were made in the supplements from time to time so it would appear that the matter was constantly in the forefront, as far as the railroads are concerned. It is difficult to view the matter as a casual, single inadvertence.

The rule has been stated many times that if there is an ambiguity in a tariff any doubt in its interpretation is to be resolved in favor of the shipper. (Civ. Code, § 1654.) The Southern Pacific Company was responsible for the ambiguity, or uncertainty which existed and any doubt should be resolved against that company. (*Taylor* v. *J. B. Hill Co.*, 31 Cal.2d 373, 374 [189 P.2d 258]; *Indiana Harbor Belt R. Co.* v. *Jacob Stern & Sons*, 37 F.Supp. 690, 691); and in *Atlantic Coast Line R. Co.* v. *Atlantic Bridge Co.*, 57 F.2d 654, 655-656 it is set forth:

". . . Tariffs, like statutes, have the force of law; . . . *If they are ambiguous, or permit of two meanings, the shipper may construe them in the most favorable way to himself which the terms permit. Southern Pac.* v. *Lothrop* (C.C.A.) 15 F. (2d) 486; *American Ry. Express Co.* v. *Price Bros.* (C.C.A.) 54 F. (2d) 67; *United States* v. *Gulf Ref. Co.*, 268 U.S. 543, 45 S.Ct. 597, 69 L.Ed. 1082. . . . It is equally clear that a carrier may not, under a tariff couched in general terms, which, if interpreted in one way, will produce a higher, in another a

lower, rate, insist upon the interpretation which gives it the higher rate. *In short, in a situation of that kind, the shipper who has to pay the freight may call the tune.* (Emphasis added.)

". . . The intention thus manifested in the words of the tariff is alone the intention to which the law gives effect. *Beaumont, Sour Lake R.R.* v. *Magnolia Provision Co.* (C.C.A.) 26 F. (2d) 72." See also *Union Wire Rope Corp.* v. *Atchison, T. & S. F. Ry. Co.,* 66 F.2d 965, 966-967 where it is said:

"A rate tariff is in essence a statement by the carrier to possible shippers that it will furnish certain services under certain conditions for a certain price. When a tariff has become legally promulgated, it is binding upon both the carrier and any shipper taking advantage of it, and its terms (in essence) become, in such respects, the only contract between the two allowed by law. *Since the tariff is written by the carrier, all ambiguities or reasonable doubts as to its meaning must be resolved against the carrier.* Not only is this simply an application of the general rule as to construction of written contracts and instruments, but, when the place occupied by transportation and the situation of shippers are considered, it is particularly useful in application to tariffs. *The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed.*" (Emphasis added.)

Appellants rely heavily upon the case of *Bacon Bros.* v. *Alabama G.S.R. Co.,* 266 I.C.C. 303. However, a close reading of that case will demonstrate that it is not comparable in facts to the case before this court. The Bacon case is distinguishable in many respects; among others in Bacon the shipper sought to have applied an unlawful rate and there it also sought to have an aggregate rule applied which is not the same as the combination rate as set forth in Item 245 of Tariff 88-T. See also *National Pressed Steel Co.* v. *Alabama G.S.R. Co.,* 289 I.C.C. 673.

There can be no question but that the rate established in this case is lawful and proper. The supplements were properly filed with the Public Utilities Commission and became effective within legal limits.

Appellants further assert that the equities are with them and that such equities require a reversal of the judgment. It was appropriately stated in *Armour & Co.* v. *Atchison, T. & S. F. Ry. Co.,* 254 F.2d 719, 723 (cert. denied by Supreme Court, 358 U.S. 840 [79 S.Ct. 63, 3 L.Ed.2d 75]) :

"Much of appellants' brief questions what is characterized as the basic injustice of the result sought to be achieved in this case by appellee. Appellants point out that appellee has, by stipulation, admitted that it was aware of the existence of the Hurst Mill Spur rate either late in 1948 or early in 1949 but continued to pay the 'going' rate without protest. There was no reliance by appellee on any conduct of the railroads which resulted in damage to appellee. *This recovery is, in effect, a windfall.* Appellants concede, however, as they must, that *the legality of the rate claimed applicable is not dependent upon the equities involved.* The only lawful rate is the rate published in the tariff. *New York Central & Hudson River Railroad Co.* v. *York & Whitney Co.*, 1921, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016; *Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co.* v. *Fink*, 1919, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151." (Emphasis added.) See also *Silent Sioux Corp.* v. *Chicago & North Western Ry. Co.*, 262 F.2d 474, 475. In *New York Central R.R. Co.* v. *F. H. Buck Co.*, 2 Cal.2d 384 [41 P.2d 547], our Supreme Court has held in effect that regardless of any equitable considerations no equitable estoppel can arise to prevent a carrier from collecting whatever charge is prescribed by the tariff. (See *Pennsylvania R.R. Co.* v. *Midstate Horticultural Co., Inc.*, 21 Cal.2d 243 [131 P.2d 544]; *Baldwin* v. *Scott County Milling Co.*, 307 U.S. 478, 485 [59 S.Ct. 943, 83 L.Ed. 1409].)

In a nutshell the problem is whether the station "El Centro" as printed in the tariffs shall be construed to mean El Centro or El Cerrito. We think the trial court was entirely proper in concluding in effect that El Centro means El Centro and that it was also correct in otherwise interpreting and construing the tariffs.

In any event, as heretofore pointed out, where extrinsic evidence is introduced as was done in this case to aid in the interpretation of the documents (tariffs) any reasonable construction thereof by the trial judge will be upheld.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied December 27, 1960, and appellants' petition for a hearing by the Supreme Court was denied January 31, 1961.