[L. A. No. 27434.   In Bank.   June 17, 1965.]

CEJAY PARSONS, Plaintiff and Appellant, v. BRISTOL DEVELOPMENT COMPANY et al., Defendants and Respondents.

862

Floyd H. Norris as Amicus Curiae on behalf of Plaintiff and Appellant.

Felix H. McGinnis for Plaintiff and Appellant.

Launer, Chaffee & Hanna, Daniel L. Stack, Miller, Nisson, Kogler & Wenke and Clark Miller for Defendants and Respondents.

C. Douglas Wikle, Walter Atkinson, W. Alan Thody, Dell L. Falls, Cooper & Boller, Rowland, Paras & Clowdus and Gloyd T. Clowdus as Amici Curiae on behalf of Defendants and Respondents.

TRAYNOR, C. J.—In December 1960 defendant Bristol Development Company entered into a written contract with plaintiff engaging him as an architect to design an office building for a lot in Santa Ana and to assist in supervising construction. Plaintiff's services were to be performed in two phases. He completed phase one, drafting preliminary plans and specifications, on January 20, 1961, and Bristol paid him $600.

The dispute concerns Bristol's obligation to pay plaintiff under phase two of the contract. The contract provided that "a condition precedent to any duty or obligation on the part

of the OWNER [Bristol] to commence, continue or complete Phase 2 or to pay ARCHITECT any fee therefor, shall be the obtaining of economically satisfactory financing arrangements which will enable OWNER, in its sole judgment, to construct the project at a cost which in the absolute decision of the OWNER shall be economically feasible.'' It further provided that when Bristol notified plaintiff to proceed with phase two it should pay him an estimated 25 per cent of his fee, and that it would be obligated to pay the remaining 75 per cent ''only from construction loan funds.''

Using plaintiff's preliminary plans and specifications, Bristol obtained from a contractor an estimate of $1,020,850 as the cost of construction, including the architect's fee of 6 per cent. On the basis of this estimate, it received an offer from a savings and loan company for a construction loan upon condition that it show clear title to the Santa Ana lot and execute a first trust deed in favor of the loan company.

Shortly after obtaining this offer from the loan company, Bristol wrote plaintiff on March 14, 1961, to proceed under phase two of the contract. In accordance with the contract, Bristol paid plaintiff $12,000, an estimated 25 per cent of his total fee. Thereafter, plaintiff began to draft final plans and specifications for the building.

Bristol, however, was compelled to abandon the project because it was unable to show clear title to the Santa Ana lot and thus meet the requirements for obtaining a construction loan. Bristol's title became subject to dispute on May 23, 1961, when defendant James Freeman filed an action against Bristol claiming an adverse title.[1] On August 15, 1961, Bristol notified plaintiff to stop work on the project.

Plaintiff brought an action against Bristol and Freeman to recover for services performed under the contract and to foreclose a mechanic's lien on the Santa Ana lot. The trial court, sitting without a jury, found that Bristol's obligation to make further payment under the contract was conditioned upon the existence of construction loan funds. On the ground that this condition to plaintiff's right to further payment was not satisfied, the court entered judgment for defendants. Plaintiff appeals.

The trial court properly admitted evidence extrinsic to the written instrument to determine the circumstances under

---

[1]Freeman had previously conveyed the Santa Ana lot to Bristol on October 1, 1960, with the understanding that Bristol would construct an office building upon the lot and pay Freeman an annuity.

which the parties contracted and the purpose of the contract. (Code Civ. Proc., § 1860; Civ. Code, § 1647; see Corbin, *The Interpretation of Words and the Parol Evidence Rule,* 50 Cornell L.Q. 161.) There is no conflict in that evidence. Bristol contends, however, that an appellate court is compelled to accept any reasonable interpretation of a written instrument adopted by a trial court whether or not extrinsic evidence has been introduced to interpret the instrument and whether or not that evidence, if any, is in conflict. We do not agree with this contention.

Since there has been confusion concerning the rules for appellate review of the interpretation of written instruments (see *Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825] [concurring opinion]; *Estate of Shannon,* 231 Cal.App.2d 886, 889-890 [42 Cal.Rptr. 278]), it is appropriate here to define the scope of such review.

■ The interpretation of a written instrument, even though it involves what might properly be called questions of fact (see Thayer, Preliminary Treatise on Evidence, pp. 202-204), is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. (See Civ. Code, §§ 1635-1661; Code Civ. Proc., §§ 1856-1866.)
■ Extrinsic evidence is "admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible" (*Coast Bank* v. *Minderhout,* 61 Cal. 2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Nofziger* v. *Holman,* 61 Cal.2d 526, 528 [39 Cal.Rptr. 384, 393 P.2d 696]; *Imbach* v. *Schultz,* 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]), and it is the instrument itself that must be given effect. (Civ. Code, §§ 1638, 1639; Code Civ. Proc., § 1856.) ■ It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. ■ Accordingly, "An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation]." (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]. Accord, *Moore* v. *Wood,* 26 Cal.2d 621, 629-630 [160 P.2d 772]; *Western Coal & Mining Co.* v. *Jones,* 27 Cal.2d 819, 826-827 [167 P.2d 719, 164 A.L.R. 685]; *Estate of*

*Wunderle*, 30 Cal.2d 274, 280 [181 P.2d 874]; *Estate of Fleming*, 31 Cal.2d 514, 523 [190 P.2d 611]; *Meyer* v. *State Board of Equalization*, 42 Cal.2d 376, 381 [267 P.2d 257].)[2]

█ It is true that cases have said that even in the absence of extrinsic evidence the trial court's interpretation of a written instrument must be accepted "if such interpretation is reasonable, or if [it] is one of two or more reasonable constructions of the instrument" (*Prickett* v. *Royal Ins. Co.*, 56 Cal.2d 234, 237 [14 Cal.Rptr. 675, 363 P.2d 907, 86 A.L.R. 2d 711]; *Lundin* v. *Hallmark Productions, Inc.* 161 Cal.App. 2d 698, 701 [327 P.2d 166]), or if it is "equally tenable" with the appellate court's interpretation (*Estate of Northcutt*, 16 Cal.2d 683, 690 [107 P.2d 607]; accord, *Estate of Cuneo*, 60 Cal.2d 196, 201 [32 Cal.Rptr. 409, 384 P.2d 1]). Such statements are not in conflict with *Estate of Platt, supra*, 21 Cal.2d 343, if they are interpreted, as they should be, to mean only that an appellate court must determine that the trial court's interpretation is erroneous before it may properly reverse a judgment. (See *Estate of Shannon*, 231 Cal.App. 2d 886, 893 [42 Cal.Rptr. 278].) They do not mean that the appellate court is absolved of its duty to interpret the instrument.

Since there is no conflict in the extrinsic evidence in the present case we must make an independent determination of the meaning of the contract. After providing for payment of an estimated 25 per cent of plaintiff's fee upon written notice to proceed with phase two, paragraph 4 of the contract makes the following provisions for payment:

---

[2]We disapprove language in *Estate of Rule*, 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319], to the effect that an appellate court must accept a trial court's interpretation of a written instrument when "conflicting inferences may be drawn" from extrinsic evidence. The rule of *Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825], and the cases applying it make it clear that it is only when conflicting inferences arise from conflicting evidence, not from uncontroverted evidence, that the trial court's resolution is binding. "The very possibility of . . . conflicting inferences, actually conflicting interpretations, far from relieving the appellate court of the responsibility of interpretation, signalizes the necessity of its assuming that responsibility." (*Estate of Rule, supra*, 25 Cal.2d at p. 17 [dissenting opinion].) Language in *E. K. Wood Lumber Co.* v. *Higgins*, 54 Cal.2d 91, 94 [4 Cal.Rptr. 523, 351 P.2d 795]; *Faus* v. *Pacific Electric Ry. Co.*, 146 Cal.App.2d 370, 375 [303 P.2d 814]; *Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210 P.2d 757], invoking *Estate of Rule*, is likewise disapproved. A similar statement concerning conflicting inferences from uncontroverted evidence in *Estate of Jones*, 55 Cal.2d 531, 538 [11 Cal.Rptr. 574, 360 P.2d 70], is also disapproved. The cases cited in support of such a rule by the *Jones* case did not involve the interpretation of written instruments.

"4. ....

"(a) ....

"(b) Upon completion of final working plans, specifications and engineering, or authorized commencement of construction, whichever is later, a sum equal to SEVENTY-FIVE (75%) PER CENT of the fee for services in Phase 2, less all previous payments made on account of fee; provided, however, that this payment shall be made only from construction loan funds.

"(c) The balance of the fee shall be paid in equal monthly payments commencing with the first day of the month following payments as set forth in Paragraph 4(b); provided, however, that TEN (10%) PER CENT of the fee based upon the reasonable estimated cost of construction shall be withheld until thirty (30) days after the Notice of Completion of the project has been filed.

"(d) If any work designed or specified by the ARCHITECT is abandoned of [sic] suspended in whole or in part, the ARCHITECT is to be paid forthwith to the extent that his services have been rendered under the preceding terms of this paragraph. Should such abandonment or suspension occur before the ARCHITECT has completed any particular phase of the work which entitles him to a partial payment as aforesaid, the ARCHITECT's fee shall be prorated based upon the percentage of the work completed under that particular phase and shall be payable forthwith."

■ Invoking the provision that "payment shall be made only from construction loan funds," Bristol contends that since such funds were not obtained it is obligated to pay plaintiff no more than he has already received under the contract.

Plaintiff, on the other hand, contends that he performed 95 per cent of his work on phase two and is entitled to that portion of his fee under subdivision (d) of paragraph 4 less the previous payment he received. He contends that subdivision (d) is a "savings clause" designed to secure partial payment if, for any reason, including the lack of funds, the project was abandoned or suspended. Plaintiff would limit the construction loan condition to subdivision (b), for it provides "that *this payment* shall be made only from construction loan funds" (emphasis added), whereas the other subdivisions are not expressly so conditioned.

The construction loan condition, however, cannot reasonably be limited to subdivision (b), for subdivisions (c) and

(d) both refer to the terms of subdivision (b) and must therefore be interpreted with reference to those terms. Thus, the "balance of the fee" payable "in equal monthly payments" under subdivision (c) necessarily refers to the preceding subdivisions of paragraph 4.[3] In the absence of evidence to the contrary, subdivision (d), upon which plaintiff relies, must likewise be interpreted to incorporate the construction loan condition (Civ. Code, § 1641), for it makes explicit reference to payment under preceding subdivisions by language such as "under the preceding terms" and "partial payment as aforesaid." Subdivision (d) merely provides for accelerated payment upon the happening of a contingency. It contemplates, however, that construction shall have begun, for it provides for prorated payment upon the abandonment or suspension in whole or in part of "any work designed or specified by the Architect." Implicit in the scheme is the purpose to provide, after initial payments, for a series of payments from construction loan funds, with accelerated payment from such funds in the event that construction was abandoned or suspended. Although plaintiff was guaranteed an estimated 25 per cent of his fee if the project was frustrated before construction, further payment was contemplated only upon the commencement of construction. This interpretation is supported by evidence that plaintiff knew that Bristol's ability to undertake construction turned upon the availability of loan funds. Accordingly, the trial court properly determined that payments beyond an estimated 25 per cent of plaintiff's fee for phase two were to be made only from construction loan funds.

When "payment of money is to be made from a specific fund, and not otherwise, the failure of such fund will defeat the right of recovery." (*Rains* v. *Arnett,* 189 Cal. App.2d 337, 347 [11 Cal.Rptr. 299].) Although there are exceptions to this rule, plaintiff has neither alleged nor proved facts that entitle him to recover on the ground of any exception.

Each party to a contract has a duty to do what the contract presupposes he will do to accomplish its purpose. (*Bewick* v. *Mecham,* 26 Cal.2d 92, 99 [156 P.2d 757, 157 A.L.R. 1277].) Thus, "A party who prevents fulfillment of a condition of his own obligation ... cannot rely

---

[3]Although neither the amount of each monthly payment nor the number of payments was specified, the amount and number could be determined from the time estimated to construct the building.

on such condition to defeat his liability." (*Bewick* v. *Mecham, supra,* 26 Cal.2d at p. 99; *Pacific Venture Corp.* v. *Huey,* 15 Cal.2d 711, 717 [104 P.2d 641].) Plaintiff, however, has not shown that Bristol failed to make the proper and reasonable efforts that were contemplated to secure the loan from which he was to be paid. (Cf. *Rosenheim* v. *Howze,* 179 Cal. 309 [176 P. 456].) The risk that a loan might not be obtained even though Bristol acted properly and in good faith was a risk clearly anticipated even though the reason the loan failed may not have been foreseen.

Nor has plaintiff established grounds for applying the doctrine of equitable estoppel to deny Bristol the right to invoke the construction loan condition. (See Code Civ. Proc., § 1962, subd. 3.) If, by its letter of March 14, asking plaintiff to proceed with his work under phase two of the contract, Bristol had induced plaintiff to believe that funds had been obtained, and if plaintiff had reasonably relied upon such representation, Bristol could not invoke the condition to defeat its contractual liability. Reasonable reliance resulting in a foreseeable prejudicial change in position is the essence of equitable estoppel, and therefore a compelling basis for preventing a party from invoking a condition that he represented as being satisfied. (See *Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.,* 54 Cal.2d 773, 778-781 [8 Cal.Rptr. 448, 356 P.2d 192]; cf. *Drennan* v. *Star Paving Co.,* 51 Cal.2d 409, 414-415 [333 P.2d 757].) Bristol, however, did not represent that funds had been obtained, and plaintiff did not reasonably rely upon the existence of construction loan funds when he undertook work under phase two of the contract. A representative of Bristol told plaintiff before he began phase two of his work that although Bristol would be able to pay plaintiff $12,000, an estimated 25 per cent of his fee, "they would not be able to proceed unless actual construction funds were obtained." Plaintiff, knowing that funds had not been obtained, nevertheless chose to proceed with his work on the project.

Finally, plaintiff has not shown that Bristol breached the duty to give him notice when it became clear that construction funds could not be obtained. Without such funds the purpose of the contract would have been frustrated and plaintiff could not have been paid the balance of his fee. Plaintiff therefore would have been excused from performing so long as there was a reasonable doubt as to his compensation. Whether or not such funds were obtained was a matter

peculiarly within Bristol's knowledge. Accordingly, Bristol had a duty to notify plaintiff that the project was imperiled when Freeman filed his action against Bristol on May 23, for Bristol then knew or should have known that it would be unable to obtain a loan. Plaintiff, however, has not shown that he failed to receive such notice, and even if it is assumed that he had no notice, he did not prove the extent to which he suffered damages by continuing to work after he should have received notice.

The judgment is affirmed.

McComb, J., Peters, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

Appellant's petition for a rehearing was denied July 14, 1965.