[No. C042502. Third Dist. Oct. 29, 2003.]

JIM HARD et al., Plaintiffs and Respondents, v.
CALIFORNIA STATE EMPLOYEES ASSOCIATION, Defendant and
Appellant.

1344

**COUNSEL**

Horvitz & Levy, Barry R. Levy, Jeremy B. Rosen; Anne M. Giese, Nancy Y. Yamada and Jay Dyer for Defendant and Appellant.

Katzenbach and Khtikian and Christopher W. Katzenbach for Plaintiffs and Respondents.

**OPINION**

**DAVIS, J.**—The Civil Service Division (CSD) of defendant California State Employees Association (CSEA), having breathed deep of the intoxicating aroma of self-determination, sought to incorporate as an independent affiliate of the CSEA. As in so many troubled marriages, the CSEA is unwilling to let the CSD leave.

Initially, the CSEA refused to give effect to a vote of CSD members in favor of incorporation, raising procedural objections. We rejected these in *Hard v. California State Employees Assn.* (2002) 96 Cal.App.4th 708 [117 Cal.Rptr.2d 615] (*Hard*), and thus affirmed the March 2001 judgment of the trial court, which issued a writ directing the CSEA to acknowledge the vote and commence the affiliation process.

The parties are back before us. The CSEA failed to issue the CSD a charter establishing its affiliate status. Plaintiffs Jim Hard and Cathy Hackett, representatives of the CSD, therefore brought a motion to enforce the writ against the CSEA. The trial court found that under the plain language of the CSEA's bylaws, the CSD was entitled to issuance of its charter. Rather than accept this interpretation of straightforward language, the CSEA has again appealed, making the same arguments that the trial court termed "artful" but "circuitous." We shall affirm with the hope that there will be an end to the CSEA's contumacy over this change in internal organization that represents the wishes of the people whom the CSEA exists to serve.

## BACKGROUND

Once again, the pertinent facts are few and undisputed. "The CSEA is an employee organization [Gov. Code, § 3513, subd. (a)] comprised of four distinct classes: the [CSD] (consisting of active employees in the civil service organized in nine bargaining units), state university employees, supervisory employees, and retirees. The CSEA is the recognized exclusive representative for the active employees in the civil service in their labor relations with the Governor. [Gov. Code, §§ 3513, subd. (b), 3515.5, 3520.5, 3541.3, subd. (c).]" (*Hard, supra,* 96 Cal.App.4th at p. 711, fns. omitted.)

Under the CSEA bylaws, any of the four classes, while retaining membership in the CSEA, can organize itself as a separate corporation, known as an affiliate. The bylaws obligate the CSEA to cooperate in good faith with the efforts of a class to organize as an affiliate. (*Hard, supra,* 96 Cal.App.4th at p. 711.)

At the September 2000 regular meeting of the general council of the CSEA, CSD delegates held a meeting at which they voted in favor of incorporation as an affiliate and adopted a budget. (*Hard, supra,* 96 Cal.App.4th at p. 713.) As noted, the CSEA refused to give effect to this vote. The plaintiffs successfully petitioned for a writ of traditional mandamus on behalf of the CSD, compelling the CSEA to recognize the vote in favor of incorporation and commence the affiliation process. (*Id.* at p. 710.)

In June 2002, after the *Hard* remittitur issued, the CSEA filed its return to the writ in which it noted the parties were in the process of negotiating a

service agreement. A month later, the plaintiffs filed their motion to compel the CSEA to comply with the writ by issuing a charter to the CSD (under its new corporate name of the Union [*sic*][1] of California State Workers), asserting that the CSD had completed the four prerequisites for a charter under the bylaws. Under article IX, section 2, of the bylaws, these include completing the incorporation process, obtaining recognition as a tax-exempt entity, accruing adequate capital for operations, and entering into a service agreement with the CSEA.

The focus of the dispute is the mechanism for resolving the July 2002 impasse on the terms of the new service agreement (the details of which are not material to this appeal). The CSEA asserted in the negotiations that impasse entitled it to invoke binding arbitration to set the terms of the service agreement, and thus the CSD was not entitled to a charter until the completion of that process. The CSD insisted, however, that on impasse the bylaws deemed the previously existing service agreement between the parties for the prior year to constitute the terms of the new service agreement with the affiliate for the next two years. As this satisfied the prerequisite, the CSD believed it was now entitled to its charter.

As we noted above, the trial court concluded that the plain language of the CSEA bylaws did not support the CSEA's position. It thus ordered the CSEA to issue an affiliate charter to the CSD.[2]

## DISCUSSION

### I

Article IX of the CSEA bylaws contains the provisions for the affiliation process. As noted, section 2 sets out the four conditions which a class must satisfy before it can receive a charter as an affiliate, the fourth of which involves the need to negotiate a service contract with the CSEA. In pertinent part, it provides: "Prior to receiving a charter, an affiliate shall also enter into a service contract with the [CSEA] pursuant to Article IX, Section 6. . . . If the proposed affiliate is otherwise eligible for a charter but cannot reach agreement with the [CSEA] on such service contract, it shall be deemed to have entered into a contract for services of the same kind and amount, and at the

---

[1] The preferred terminology in the State Employer-Employee Relations Act for an entity that bargains on behalf of workers in the executive branch is an "employee organization." (Gov. Code, § 3513, subd. (a).)

[2] The CSEA has requested that we take judicial notice of matters in the trial court subsequent to the notice of appeal. As these are irrelevant to the issues on appeal, we will deny the motion. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

same rates, as it used during the last year it was an unincorporated division, . . . and its charter shall thereupon be issued." Section 6 governs the general subject of services. It obligates the CSEA to provide the same services to an affiliate that it provides to any other division or affiliate at cost (and obligates an affiliate to reimburse a proportional share of the CSEA's indirect costs), specifies a two-year term for a service contract, provides for modification of the service contract through change orders, and provides a mechanism for the resolution of disputes in the negotiation and administration of a service contract. In this latter context, the bylaws prescribe in section 6 (e)(1) that if "the parties are unable to agree on a *new contract* by a date no later than 120 days before the *expiration of the current service contract*, the matter shall be referred to arbitration . . . . The decision of the arbitrator . . . shall be final and binding on both parties, and shall establish the terms of the service contract between such parties for the forthcoming contract period." (Emphasis added.) Section 6 (e)(2) provides, "*Any other disputes* involving the interpretation or enforcement of, or compliance with, this Section 6 or any service contract shall likewise be resolved by arbitration . . . ." (Emphasis added.)

Although buried deep in the CSEA brief, the issue of the proper standard of review is primary. While it is undisputed that we exercise de novo review of a trial court's interpretation of a written instrument absent the need for extrinsic evidence of intent (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]), the preliminary question of judicial review of a private organization's interpretation of its bylaws is more nuanced.

■ A court may review a private organization's interpretation of straight-forward bylaw language only where it is unreasonable, does not involve an arcane rule within the peculiar knowledge of the organization, and does not depend on the organization's rituals and customs. Even then, the judiciary may intercede in the private dispute only where the interests of the challenging party outweigh the burden on the judiciary and the autonomy interest of the private organization. (*California Dental Assn. v. American Dental Assn.* (1979) 23 Cal.3d 346, 350, 353–354 [152 Cal.Rptr. 546, 590 P.2d 401] (*CDA*); *Hard, supra,* 96 Cal.App.4th at p. 714; *California Trial Lawyers Assn. v. Superior Court* (1986) 187 Cal.App.3d 575, 579–580 [231 Cal.Rptr. 725] (*CTLA*); *Fry v. Pekarovich* (1975) 46 Cal.App.3d 165, 169 [120 Cal.Rptr. 55] [holding questioned in *CTLA, supra,* 187 Cal.App.3d at p. 581, to extent it suggests judiciary need never defer to organization's interpretation of a bylaw].)

As the trial court concluded, the CSEA's interpretation of straightforward bylaw provisions is unreasonable. Section 2 of article IX focuses on a

fledgling affiliate's initial service contract with the CSEA, specifically providing that failure to reach agreement on its terms is not a basis for denying the new affiliate a charter. This is because the kind, amount, and rates for services in the existing agreement with the former division will then be deemed to be the terms of the new agreement. The general reference in section 2 to section 6 clearly contemplates the substantive provisions in section 6, not the mechanism for the resolution of disputes; otherwise, the directive in section 2 to incorporate the language of the existing service contract would be meaningless, an irrational construction (e.g., Civ. Code, § 1641).

For that matter, the provisions regarding dispute resolution in article IX, section 6, on their face do not rationally apply in the context of an initial service contract. Section 6 (e)(1)—expressly applying to "Negotiation of Service Contract"—contemplates negotiations upon the expiration of an existing service contract; section 6 (e)(2) arises only in connection with the interpretation or enforcement of a service contract, which again presupposes an existing contract, or of compliance with the substantive provisions of section 6 (which are not at issue in the present dispute). There is no indication in the record that interpretation of this provision involves the past practice and customs of the CSEA (the CSD being the first class to seek to become an incorporated affiliate). The harmonization of sections 2 and 6 does not rely on arcana within the particular expertise of the CSEA. As a result, it is appropriate to second-guess the CSEA unless the balance of interests in this dispute mandates our abstention.

The burden this particular dispute poses to the judiciary is minor, as the interpretation of the bylaws is not a complex task. (*CDA, supra,* 23 Cal.3d at p. 355.) There is an infringement of the CSEA's autonomy, but no more than judicial review infringes on any private organization; we otherwise cannot find legitimate interests worthy of protection in a representative organization's desire to stifle the wish of its membership for new leadership (a strong countering interest). Finally, *CDA* expressly relies on cases approving judicial intervention in disputes between local and parent unions over interpretations of the parent's bylaws as the basis for its intervention by analogy in the dispute between the organizations in *CDA*. (23 Cal.3d at p. 354.) The present case is a similar dispute in the context of public employee organizations.

In short, it was appropriate for the trial court to review the CSEA's interpretation of its bylaws. We agree on de novo review that the provisions for binding arbitration do not apply to the initial service contract that is a condition of receiving a charter from the CSEA.

## II

The CSEA also contends that the order of the superior court is insufficiently certain because it does not itself set forth the terms of the service contract between the parties. CSEA also claims that the order must be modified to include a provision that resolves which party is to collect the dues of the members of the new affiliate. These arguments are not well taken.

The trial court's order directs the CSEA to "complete the [affiliation] process forthwith by using the default provision for service agreements pursuant to Article IX, section 2(d) of [CSEA]'s bylaws and issue the Charter . . . ." The issue before the trial court was not the *contents* of the service contract between the parties but the *process* by which to fix its contents.

In the CSEA's specific concern with the subject of the power to collect dues (which is central to the existence of any labor organization), the bylaws do not contemplate CSEA having any *entitlement* to this power on which it may insist in negotiating a service contract. Before affiliation, only the CSEA has authority under the bylaws to collect dues on behalf of its divisions.[3] However, once an affiliate receives its charter, "[t]he [CSEA] shall have no authority to levy any dues, fees, or assessment on its members who belong to an affiliate. Each affiliate shall own and control its own assets, and shall make payments to the [CSEA]" under the terms of its service contract. (Art. IX, § 5(a).) Pending affiliation, the CSEA acts only as a trustee, collecting the dues that the affiliate members pay, and must transfer the funds to the affiliate once it issues the charter. (*Id.*, § 5(b).) Only upon surrender or cancellation of its charter does an affiliate "lose all power to . . . collect dues . . . ." (*Id.*, § 8(d)(1).) Thus, when the bylaws provide that "[t]he dues, fees, and assessments payable by each member of any affiliate may be collected by the affiliate or the [CSEA] for the account of such affiliate" (*id.*, § 5(d)), it is plain from the context that the affiliate is empowered to collect dues. It is thus for the affiliate to decide if it wants to *grant* the CSEA the power to collect dues, and not for the CSEA to claim it as a right. As dues collection is outside the proper mandatory terms of a service contract (unless the CSD wishes to surrender the power), the order need not include any directive to that effect.

There were indications at oral argument that the CSEA will attempt further to resist complying with the trial court's order through the device of raising additional claims of "uncertainty" over the terms of the service agreement. In

---

[3] While each division is entitled "to set its own budget and establish its own dues and fees" (art. VIII, § 4(b)), "[t]he dues and fees payable by the members of each division shall be collected by the [CSEA] for the account of such division," from which the CSEA is entitled to deduct (before remitting the funds to the division) any amounts due for services it has provided to the division or for the CSEA's indirect costs. (*Id.*, §§ 4(c), 5(b).)

an effort to keep the CSEA from running itself aground on the shoals of contempt proceedings in the trial court, let us make the status of the parties clear: there is nothing further to negotiate regarding the issuance of the charter. Once the parties reached impasse, the default provision in the bylaws acts simply to maintain the status quo between the parties for the first two years of the new affiliate's existence. Whatever services the CSEA provided during the CSD's final year as an affiliate will continue at the same rates. There is no need to execute a written instrument to this effect as a prerequisite to issuing the charter. Thus, upon the finality of this opinion, the CSEA shall issue a charter to the CSD forthwith.

## DISPOSITION

The motion for judicial notice is denied. The order of the trial court is affirmed.

Sims, Acting P. J., and Hull, J., concurred.