[Civ. No. 27845. Second Dist., Div. Four. Aug. 10, 1965.]

LAROSE F. NICHOLSON, Plaintiff, Cross-defendant and Appellant, v. FRANK S. WADE, Defendant, Cross-complainant and Appellant.

Walter M. Campbell and Leo A. Burgard for Plaintiff, Cross-defendant and Appellant.

Leonard B. Hankins and James J. Baker for Defendant Cross-complainant and Respondent.

FILES, P. J.—This action was brought to recover the sum of $284,300 claimed as the balance of the purchase price of shares of stock sold to defendant under a written contract. Defendant cross-complained against plaintiff and her husband for damages for their fraud in inducing him to enter into the contract. After a trial without a jury the court construed the contract and concluded that defendant was not obligated to pay any further sum thereunder. On the cross-complaint the court found that cross-defendants had willfully made false representations of fact upon which cross-complainant had relied, but that no damage had resulted. Judgment was for defendant on the complaint and for cross-defendants on the cross-complaint.

The judgment was entered October 19, 1962. There was no notice of motion for a new trial. Plaintiff filed her notice of appeal from the judgment on December 18, 1962. Defendant and cross-complainant filed a notice of cross-appeal on December 21, 1962. The latter notice not having been filed within sixty days from the entry of the judgment as required by rule 2(a) of the California Rules of Court, the cross-appeal must be dismissed. (*County of Los Angeles* v. *Jamison*, 189 Cal.App.2d 267 [11 Cal.Rptr. 309].)

The determination of this appeal requires an interpreta-

tion of the written agreement whereby Mrs. Larose F. Nicholson, plaintiff herein, sold certain stock of the Bank of Belmont Shore to defendant Frank S. Wade. As an aid to interpretation, the trial court received evidence of the circumstances surrounding the making of the agreement and the declarations of the parties and their agents both before and after the time of execution. For the most part the evidentiary facts are not in conflict, and such conflicts as do appear are unimportant to the decision. The circumstances which shed light upon the question will therefore be summarized without detailing the manner in which the evidence was produced.

Plaintiff's husband, James H. Nicholson, was the president of the Bank of Belmont Shore from the time it opened in 1953 until he was forced to resign on December 20, 1957. An examination by state banking officials in December 1957 disclosed a number of irregularities and in January 1958 a criminal complaint was filed in federal court charging Nicholson with embezzlement and other violations of the banking laws.

Mr. and Mrs. Nicholson had a substantial investment in the stock of the bank. Defendant Wade was the owner of two corporations which owned a number of shares in the bank. All parties recognized that it was essential to establish a new management in the bank. About March 1, 1958, discussions began between Wade and the Nicholsons regarding possible solutions to the problem. At that time it was known that the bank examiners were critical of the bank's condition but they had not completed their study. Under these circumstances it was impossible for any prospective purchaser to know what the bank stock was actually worth.

There was a meeting of the parties on March 16, at which Mr. Nicholson said he was anxious to have something done immediately. Wade said that at the next meeting he would bring checks totaling $60,000 ''and that some transaction would be entered into.''

The next meeting was at the Nicholson residence on March 18. A voting trust was discussed. Wade's attorney, who was present, pointed out that it would take some time to prepare the necessary documents. Mr. Nicholson insisted that something had to be done immediately.

The parties then prepared and signed a two page typewritten document whereby Wade agreed to buy and Mrs. Nicholson agreed to sell 3,851 shares at a price to be agreed upon in the future, not less than $30 and not more than $100

per share. Mrs. Nicholson acknowledged receipt of $60,000 on account. The document provided that if the parties could not agree upon a price by March 18, 1961, Wade was to retransfer the stock and Mrs. Nicholson was to return the money received with interest.

After this document was signed, Wade's attorney had a conversation with the banking examiners, who told him that the state banking department wanted Mr. Nicholson out of the bank and that if Mr. Nicholson had any stock the bank would be closed. On the basis of this conversation Wade's attorney concluded that the March 18 contract, which left the price subject to future agreement, would not satisfy the banking department. A further meeting was held at the Nicholson home on March 20, at which time the parties negotiated and executed the agreement which is the subject of this lawsuit. The signed copies of the March 18 document were then destroyed. The final agreement, which was in the form of a letter, dated March 18, 1958, though executed on March 20, will be referred to herein as the 1958 contract. The pertinent portions are as follows:

"Dear Mrs. Nicholson:

"I have this date purchased from you or through you 3843 shares of the capital stock of Bank of Belmont Shore and you have agreed to furnish to me voting rights on sufficient additional shares of said stock to constitute at least 51% of the voting control of said corporation.

"The purchase price of said shares payable to you is the sum of $100.00 per share, or an aggregate of $384,300.00. Said sum is payable $60,000.00 upon your execution of this letter as evidence of our agreement, receipt of which you acknowledge; $20,000.00 on or before the 19th day of September, 1958; and $20,000.00 on or before the 19th day of September, 1959; and the balance of said purchase price on or before the 19th day of March, 1960. Upon the payment to you of an additional sum on account of said purchase price of $30,000.00 on or before March 19, 1960, I shall have an option to extend the payment of the balance of said purchase price to on or before the 19th day of March, 1961, and upon payment of such balance this agreement shall terminate.

"In the event of any default by me in the performance of the terms and conditions of this agreement, I shall re-deliver to you said shares of stock upon your payment to me of any sums theretofore paid you by me on account of this agree-

ment, and I shall cause to be delivered to you 1800 shares now held by me and my associates under re-purchase agreements formerly existing between us provided you shall pay for said shares at the rate of $39.20 per share plus 10% increase thereon annually from April 1, 1958, until said shares are re-delivered to you. No such demand by me shall be made prior to September 19, 1958. Should you fail to pay said sums in full or make other arrangements for payment satisfactory to me within 90 days after my offer for such re-delivery and sale, this agreement shall become null and void and of no further force or effect, and you shall have no right to receive any further sums from me on account thereof.

"I further agree upon the payment provided for in the next preceding paragraph to sell to you, at your request, such other shares as I may have purchased during the term of this agreement at the price paid for them by me, plus 10% increase thereon per annum from date of acquisition by me, and to deliver to you such voting control as I may then have.

"In this connection it is our intention that I shall eventually obtain at least 66⅔% of the issued and outstanding shares of said bank. You agree that you will cooperate and use your best efforts in helping me obtain the same. You further agree that any shares obtained by you hereafter or placed under your control hereafter shall be with the understanding that I am to have the voting rights thereon. Any shares purchased by you directly or indirectly you agree shall, at my option, either be sold to me at your purchase price, or shall be transferred to me and be added to and become subject to this agreement.

". . . . . . . . . . . .

"Very truly yours,
Frank S. Wade
"Accepted and agreed to
Larose F. Nicholson
"Approved and agreed to
James H. Nicholson"

A supplemental agreement was entered into on October 30, 1958, because Mr. Nicholson had been required to guarantee the payment of certain loans which had been made while he was president of the bank and Wade had been required to guarantee Nicholson's performance. By the October 30 sup-

plement it was agreed that any money which Wade was required to pay on his guaranty would be credited against any payments due under the stock purchase agreement.

Wade made the $20,000 payments required in September 1958 and in September 1959. On March 19, 1960, he notified Mrs. Nicholson in writing that he did not intend to make any further payments for the stock and that he therefore offered to redeliver her stock plus the other stock mentioned in the third paragraph of the 1958 contract upon her payment to him of $218,099.58, including $32,816.59 which Wade had been required to pay to the banks on his guaranty.[1]

Mrs. Nicholson did not accept the offer to retransfer the stock, but instead brought this action to recover the balance due upon the theory that Wade was obligated unconditionally to pay the full price of $100 per share for the 3,843 shares. Her argument is that the third paragraph of the 1958 contract cannot be construed as giving defendant an option because the word ''default'' is used.

The interpretation adopted by the trial court is reflected in its findings of fact which state: ''Pursuant to the terms of the written contract of March 18, 1958, defendant had the option of either continuing payments due under said contract or of not making any further payments and tendering the stock back to plaintiff upon the condition that plaintiff repay to defendant all sums which defendant had theretofor[e] paid to or on behalf of plaintiff. . . .

''. . . . . . . . . . . .

''The word 'default' as used by the parties in the March 18, 1958 written contract was not used by them in the sense of a failure to perform a duty nor in the sense of any neglect. Its meaning in context is that defendant was accorded an election to make or not to make any additional payments to plaintiff.''

Review in this appellate court is governed by the rules recently explained by the Supreme Court in *Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]. Since there is no conflict in the extrinsic evidence which appears to be significant in the interpretation of the contract, this court must make its own independent

---

[1]It is unnecessary to consider whether Wade interpreted the contract correctly in computing the amount to be paid for the retransfer. His letter stated that his offer was ''made in accordance with all of the terms and conditions of our letter agreement.'' No contention is now made by plaintiff that the computation was incorrect.

determination of the meaning of the instrument. After examining the record this court is satisfied that the trial court was correct.

■ The letter signed on March 20 grew out of an earlier agreement that left the price of the stock subject to future negotiation. It is quite clear that Wade was unwilling to agree to pay $100 per share for stock whose value he could not determine at that time. The final form of the contract was arrived at as a means whereby Wade could become an outright purchaser at a stated price, and at the same time preserve a way to force a revision of the price or a rescission.

The last sentence of the third paragraph of the agreement clearly states that if Wade tenders back the stock and Mrs. Nicholson fails to pay for it, Mrs. Nicholson "shall have no right to receive any further sums from me [Wade] on account thereof."

It is noteworthy that a preliminary draft of this agreement did not contain this final sentence of the third paragraph. In the discussion at the Nicholson home on March 20, 1958, Mr. Nicholson mentioned that this agreement would permit Mrs. Nicholson to sue Wade for the full $100 per share price even though he tendered the stock back. Wade's attorney informed Nicholson that was not their intention. Thereupon the additional sentence was inserted at the close of the third paragraph. The interpretation of the contract urged by plaintiff would give no meaning whatever to that sentence. The evidence compels the conclusion that that sentence was inserted for the particular purpose of foreclosing the claim which plaintiff has made in this action.

■ In her brief plaintiff argues that no matter what the contract said the parties could not have intended an agreement giving Wade the privilege of tendering back the stock because the parties knew that if she took the stock back the bank would be closed immediately by the state authorities. We are not impressed that this hazard was as great as the argument assumes. It is perfectly clear that as of early 1958 the public authorities would not allow James H. Nicholson to control the bank. But it was not unreasonable for the parties to assume that if, during the next three years, Mrs. Nicholson regained legal title to the stock under this agreement, the regulatory agencies would not object to her holding it temporarily for the purpose of finding another buyer. At least the possibility does not seem so remote as to preclude our

giving a literal interpretation to the language of the contract which specifically provided for a possible retransfer to Mrs. Nicholson.

Plaintiff contends that, even if the contract gave the defendant the option of tendering the stock back, he should not have been allowed to exercise this option because he violated an implied covenant of good faith and fair dealing. Plaintiff reiterates this contention in arguing ''waiver'' and ''estoppel.'' Regardless of how it is put, the argument rests upon the assumption that defendant breached his duty to plaintiff in either of two respects: (a) defendant caused 10,000 shares of new stock in the bank to be issued to the existing shareholders, including himself, and (b) defendant purchased 3,904 shares of bank stock at $95 per share a few days before he wrote the letter of March 19, 1960, tendering his holdings back to plaintiff. It is unnecessary to determine what the effect of defendant's tender would have been if his conduct prior to that date had amounted to a breach of an implied covenant because, for reasons which will be explained, it does not appear that he breached the contract.

The trial court made findings of fact that the tender of March 19, 1960, was made in good faith and without including any illegal or unfair conditions, that defendant had not breached any term or condition of the contract, and that defendant made no misrepresentation of fact to plaintiff. Since these findings are based in part upon an interpretation of the contract, it is necessary again to examine the record in order to determine whether the interpretation of the trial court was the proper one.

The 1958 contract contains no express prohibition against causing the bank to issue new stock. There can be no doubt that the issuance of new stock with voting rights would have affected the position of plaintiff if she had exercised the right to take back the 5,643 shares under the third paragraph of the agreement. The question is whether there was any implied covenant on the part of defendant that he would not, while in control of the bank, cause such a thing to be done.

James H. Nicholson testified that, before he resigned as president in December 1957, the board of directors of the bank had authorized a $200,000 increase in capitalization This was for the purpose of establishing a new branch at Seal Beach. The subject of this proposed expansion was still under discussion as late as July 23, 1958, as indicated by

memoranda written during this period by Mr. Nicholson to Wade and Wade's attorney. The record thus establishes that an increase in the authorized capital of the bank was within the contemplation of the parties when the 1958 contract was made. It is significant that the parties made no provision for protecting plaintiff against the realignment of voting power which was foreseeable in the event of an increase in capital.

Furthermore the record shows conclusively that the increase in capital which eventually took place was not the result of free choice on the part of defendant Wade and his associates, but was in response to a demand of regulatory agencies. On July 19, 1958, a representative of the Federal Reserve Bank met with the directors of the Bank of Belmont Shore. He advised that the board take immediate action to raise additional capital, and warned that the Federal Deposit Insurance Corporation would insist that additional capital be raised or the deposit insurance would be withdrawn. He estimated that between three and four hundred thousand dollars would be required.

Under date of December 5, 1958, the Federal Deposit Insurance Corporation notified the bank that it must meet a seven point corrective program. One of these requirements was that the capital account of the bank be increased by the addition of $400,000 in new capital, or in the alternative by the addition of $300,000 in new capital and a special subordinated deposit of $100,000. Wade testified that, because of this demand, the directors decided to increase the capital stock. In January 1959 10,000 new shares were issued to the existing shareholders at $30 per share. None was offered to the Nicholsons because Wade believed it was clear that the state and federal officials wanted the Nicholsons to have nothing more to do with the bank.

This increase in the number of voting shares was not a device to dilute the voting strength of the stock to which plaintiff might become entitled under the third paragraph of the 1958 contract. The record leaves no doubt that the issuance of this stock was a business necessity. This court cannot say that the written agreement between the parties here contains any implied covenant not to issue new stock under the circumstances shown by this record.

With respect to defendant's purchase of the 3,904 shares immediately preceding his tender of March 19, 1960, it is conceded that his purpose was to protect himself against the

possibility of being left in a minority position. He knew that he was about to give the notice which would make operative two different options belonging to plaintiff. The first option, under the third paragraph of the 1958 contract, was to take back the 5,643 shares specifically referred to in that paragraph. The second option was to purchase all of defendant's remaining shares under the fourth paragraph of the contract. Defendant feared that if plaintiff exercised her option under paragraph 3 and failed to exercise the option under paragraph 4, defendant would be left with a block of stock which was less than a majority. He did not want to be an investor in a bank controlled by other persons. To prevent this, he saw to it that before he sent the March 19, 1960, letter he had enough stock to retain control unless plaintiff exercised both options and bought out his entire interest. There is nothing in the record to indicate that this was not a perfectly proper objective.

At the time the contract was made it was contemplated that defendant would acquire more stock from other stockholders. The fifth paragraph of the contract states ''In this connection, it is our intention that I [defendant Wade] shall eventually obtain at least 66⅔% of the issued and outstanding shares of said bank.''

Plaintiff's brief emphasizes the fact that the 3,904 shares were purchased at a price of $95 per share, suggesting that this price is itself a reflection of bad faith. Defendant testified that he first sought to purchase stock from a Dr. Garrison, who was the second largest stockholder in the bank. Dr. Garrison demanded $100 per share. Defendant then approached some other shareholders who were friendly to him and arranged to purchase their stock for $95 per share, payable in installments over a three-year period.[2] Defendant was in a hurry to acquire the stock and did not have enough cash to pay for it outright. Plaintiff does not point to any evidence which conflicts with the foregoing explanation, or to any evidence at all that this price was not fairly arrived at under the circumstances. Under the agreement defendant himself could not profit from the high price which he had paid, for paragraph 4 of the agreement required him to sell to plaintiff at his cost. The trial court's finding that defend-

---

[2]It should be noted that Wade, as the controlling stockholder of the bank, was in no position to drive a hard bargain by arm's length trading with the minority shareholders whose stock he sought to buy. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 432 [159 P.2d 958].)

ant made no misrepresentation of fact to plaintiff disposes of any contention that these transactions were sham or that the stated price was fictitious. This finding, being supported by inferences reasonably drawn from the evidence, is conclusive here. (*Bancroft-Whitney Co.* v. *McHugh,* 166 Cal. 140, 142 [134 P. 1157].)

It should be noted that plaintiff was under no obligation to buy the $95 shares if she exercised her option to take back the shares which she had originally sold. The paragraph 3 option could have been exercised without exercising the paragraph 4 option. Defendant's purchase of the $95 shares did not interfere at all with the exercise of plaintiff's rights under paragraph 3, though it did make it more expensive for plaintiff to regain majority control had she sought to do so by exercising the paragraph 4 option. Under the express terms of the agreement defendant was entitled to purchase as much stock as he could, subject to a duty to turn it over to plaintiff at cost (plus 10 per cent increase per annum) if the options were exercised. Under the circumstances, this court cannot say that there was any implied covenant in the agreement between plaintiff and defendant forbidding his acquisition of the additional shares.

On plaintiff's appeal the judgment is affirmed. Defendant and cross-complainant's appeal is dismissed. Defendant shall recover costs.

Jefferson, J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 7, 1965.