[Civ. No. 1002,   Fifth Dist.   Feb. 4, 1969.]

BIGGE   DRAYAGE   CO., Plaintiff and Respondent, **v.** FRAZIER-DAVIS CONSTRUCTION CO. et al., Defendants and Appellants.

McDonough, Holland, Schwartz, Allen & Wahrhaftig, Armstrong, Teasdale, Kramer & Vaughan and V. Barlow Goff for Defendants and Appellants.

Rust, Hoffman & Mills and Michael C. Gessford for Plaintiff and Respondent.

STONE, J.—On September 19, 1962, appellant McCoy, construction supervisor for appellant Frazier-Davis Construction Co., rented a self-propelled crane from respondent, by telephone, for use in the construction of a coffer dam in the bed of the Feather River. As they were not certain how long the crane would be needed, respondent agreed to provide a crane with an operator and an oiler on a day-to-day basis at an hourly rate. McCoy, who had rented cranes from respondent in the past, testified that the rate usually was determined by how long the lessee kept it, but he could not remember whether he told respondent he needed the crane for a week or more.

The crane was used from October 1 to October 11, when it was damaged. The operator testified that at the end of the day on October 11 he parked the crane at a spot designated by appellants' superintendent, Wade Rowan, but on cross-examination admitted he was not sure he had been affirmatively instructed where to park, that he may have been instructed only where not to park. The crane crew locked the crane equipment and hid the keys in a secret compartment.

It had rained for approximately 24 hours prior to the time they stopped work and secured the crane on the late afternoon of October 11. By midnight the river was at flood stage, and appellant McCoy called respondent's crane operator, who came to the scene immediately. Wet wires caused delay in starting the motor and by the time it did start the equipment could not move under its own power because of the depth of the water. Another crane was moved in to assist, but the flood waters washed away the footing and the unit toppled into the river.

We are met with the threshold question of the nature of the relationship between the parties. Respondent contends, and the trial court found, that appellants "hired" the equipment complete with operating personnel. Appellants argue that they contracted for the performance of crane work, and that respondent furnished its own equipment and personnel to perform the contract. In short, each contends the other had control over and, a fortiori, responsibility for the safety of the self-propelled crane while it was on the job site.

As there was no express agreement between the parties, that is, no single writing nor single conversation that constituted the contract, the trial court, to determine the relationship between the parties, had to look to custom in the industry, to

the testimony of conversations, and to certain writings. Therefore determination of the rights and duties of the parties was largely a fact-finding process, and we follow the traditional rule that an appellate court will not set aside a finding of fact by the trial court that is supported by substantial evidence. (Cf. *Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].) With this in mind, we turn to the issue whether appellants were liable for the safekeeping of the equipment at the time of the accident.

The trial court found that appellants hired the crane from respondent for an indefinite period, on a day-to-day basis, "by means of an oral agreement," pursuant to the provisions of Civil Code section 1955,[1] that appellants failed to use the "ordinary care for its preservation in safety and in good condition" required by Civil Code section 1928, and were liable for the necessary repairs to the equipment, pursuant to Civil Code section 1929,[2] specifically finding that such repairs were occasioned by appellants' "want of ordinary care."

The trial court looked to the business custom in the rental of self-propelled cranes and to the conduct of the parties in prior, similar transactions between them. The record reflects that although respondent furnished an operator and an oiler for the crane, these employees had no control over when and where work was to be performed, nor the manner in which it was to be performed, and no right to remove the equipment from appellants' job site. As the trial court noted in its memorandum of decision:

"Whether the rental rate was daily or weekly, it was customary for the renter to retain possession during the period the equipment was to be used on the job. . . .

"Defendants' contention that the hiring was only for the particular hours of actual use and that they had no possession or rights during other periods is unrealistic. There was no occasion for removing the crane from defendants' job site and it was conceded that if plaintiff sought to use it elsewhere it would be expected to secure defendants' permission."

---

[1] Civil Code section 1955 provides "One who lets personal property must deliver it to the hirer, secure his quiet enjoyment thereof against all lawful claimants, put it into a condition fit for the purpose for which he lets it, and repair all deteriorations thereof not occasioned by the fault of the hirer and not the natural result of its use."

[2] Civil Code section 1929 provides: "The hirer of a thing must repair all deteriorations or injuries thereto occasioned by his want of ordinary care."

At the end of each workday the crane operator prepared a "Daily Crane Report" upon a printed form headed "BIGGE CRANE AND RIGGING Co." in which "Frazier Davis" is shown as "Lessee." Each such report from October 1 through the 11th, the day of the flood, is signed by an agent of appellant Frazier-Davis. On the face of each report appears the words: "Work done subject to terms on reverse side hereof and any contract with the above named lessee." The "Terms & Conditions Applicable" printed on the reverse side provide: "BIGGE CRANE AND RIGGING Co., DIVISION OF BIGGE DRAYAGE Co., hereinafter called the Owner, hereby rents and leases the equipment and supplies the operators as described on the face hereof, subject to the following conditions:

"The Lessee expressly agrees to indemnify and save the Owner harmless from and against all claims for death or injury to persons, and loss, damage or injury to property including said equipment caused or resulting, directly or indirectly, from the work covered by this order, or done by said equipment, except such as may be caused by the negligence of the Owner, its agents, servants and employees, it being expressly agreed that said equipment is under the exclusive jurisdiction and control of the Lessee. All liability for death to persons, injury, loss or damage to person or property, including said equipment, arising out of, or in connection with, or due to the excavation below the natural surface of the ground, or for the collapse of or structural injury to any building or structure due to the removal of ground, earth, support or other building or structure, and notwithstanding any provision hereof, or in law to the contrary, shall be assumed by the Lessee, and the Lessee herein agrees to indemnify and save the Owner harmless from and against any and all liability, injury, damage, loss, suit and claims, including court costs and counsel fees arising, directly or indirectly, out of or in connection therewith."

Thus we conclude the trial court correctly determined that appellants assumed the responsibility to use ordinary care in the safekeeping of the equipment so long as it remained on appellants' job site.

The question that naturally follows is whether appellants used ordinary care in the preservation of the equipment. The trial court found they did not, and summarized the evidence upon which the finding was based, thus: "The rain storm that caused the flood had started October 10th but did

not assume major proportions until the afternoon or early evening of the 11th. There was sufficient rain however to saturate the entire watershed, greatly increasing the run-off. The watershed embraces three major rivers with their numerous branches and creeks, lowest confluence of which, before debouchment into the valley, being some five or six miles up stream from the job site. In the afternoon of the 11th the river had been rising noticeably but flood stage was not anticipated until much later in the evening.

". . . . . . . . . . . . . . .

". . . from about 8 or 9 o'clock until midnight defendants' job foreman and crew spent the time removing Frazier-Davis pumps and equipment and trying to protect their temporary bridge across the river. They made no effort to call plaintiffs' operator or to inform plaintiff of the obvious and steadily mounting flood peril until about midnight. Considering the vast watershed, the continuing rain and a 10 to 12 foot rise from 8 p.m. to 10 p.m.—at which time and probably for an hour or two thereafter there is every reason to believe the crane could have been walked to safety—it is obvious that defendant knew or should have known that if action was not taken forthwith there was grave danger of precisely what happened. The preponderance of evidence places the call at shortly after midnight rather than the estimate of 11 o'clock. The crane operator's 15 or 20 minute estimate of time between his receiving the warning and arrival on the job is more credibly and in conformity with what would be natural and ordinary than the estimate of over an hour made by defendants' foreman. The answer service record also shows the call at midnight rather than 11 p.m. Meanwhile, the river had been eroding the bank of the access road. A further delay was encountered by reason of damp wires preventing immediate ignition to start the motor. This delay may or may not have been of crucial importance. However, it was not the result of negligence on anyone's part. The time between 10 p.m. and midnight, lost through negligence, remains, with the flood, the proximate cause of the damage to the truck. The flood was not a flash flood and, spectacular as it appears to have been, was not an Act of God in the legal sense. The defendants' foreman testified that at midnight, plus or minus, he thought the crane could be moved but he was not sure. Under the circumstances, the renters' liability for damages caused by his fault or negligence under the Code sections cited require judgment for plaintiff.''

This evidence amply supports the finding that appellants were guilty of negligence by their failure to use ordinary care to protect the crane "hired" from respondent.

There remains appellants' contention that respondent was guilty of contributory negligence. They assert that respondent's crew superintendent, Colburn, knew it had been storming for some time before he left the job, that he saw the rising river from a nearby bridge about 6 p.m., that at this point he could also see the position of the crane in relation to the water, which gave him warning that the crane was in a dangerous place.

At 6 p.m. the river level was 15 feet below the wheels of the crane, and there is nothing in the record to indicate that respondent's operator knew, as did appellants' superintendent, that some six feet of water was to be released upstream by P.G. & E. Additionally, appellants' superintendent, who was on the scene between 6 p.m. and midnight, was aware of the rapidly rising water, but neither he nor any of appellants' other employees at the scene conveyed this information to respondent's crane operator. As to this aspect of contributory negligence, appellants failed to meet their burden of proof.

Appellants also argue that the crane operator was contributorily negligent in failing to advise appellants' employees of the location of the keys and in not asking them to move the crane at the time he was called. Respondent's operator was not advised that the situation was this critical at the time of the call, nor that it was necessary to move the crane before he could get to the scene. The trial court was justified in concluding that in the absence of such information the operator was not negligent in failing to think about the hidden keys.

Lastly, appellants argue that respondent was contributorily negligent in not requesting the assistance of one of appellants' employees to start the motor or to move the equipment with the other crane at the scene, before the rising water undercut the footing. One of the causes for delay was that the ignition wires of the self-propelled crane were wet, but as the motor had never been difficult to start before that night there was no reason for respondent's operator to think it would not start readily. There is substantial evidence to support the trial court's conclusion that respondent's operator did everything a man of ordinary prudence would have done under like

circumstances after he was called by appellants' superintendent, and that the efficient cause of the damage to the crane was the failure of appellants' employees to call respondent's operator until the situation was in extremis.

Appellants have failed to demonstrate that they were free from negligence as a matter of law, or that respondent was guilty of contributory negligence as a matter of law. Thus the issues of negligence and contributory negligence present questions of fact for the trier of fact. The law is so well settled that a reviewing court will not set aside a finding of fact by a trial court unless there is no substantial evidence to support the finding, that we need not burden this opinion with citations of authority to that effect.

The judgment is affirmed.

Conley, P. J., and Gargano, J., concurred.