Filed 10/20/23  Smykla v. Mark CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JAMES SMYKLA,<br><br>      Plaintiff,<br><br>v.<br><br>JOHN MARK,<br><br>      Defendant and Respondent;<br><br>BODHI MARK,<br><br>      Intervenor and Appellant. | A164211<br><br>(Mendocino County Super. Ct.<br> No. SCUKCVPB201526465) |

Four family members entered into a settlement agreement to resolve an intra-family dispute over a parcel of real property located in Mendocino County.  After the litigation was dismissed, a dispute about the meaning of the settlement agreement arose, and two of the settling parties, respondent John Mark and his son appellant Bodhi Mark, filed dueling motions to enforce the settlement agreement pursuant to the court's retained jurisdiction under Code of Civil Procedure section 664.6.  Principally at issue was the meaning of a provision in the settlement agreement addressing two encumbrances on the property, both of which secured sizeable outstanding loans that respondent John Mark had taken out in his own name.

1

Ruling on those cross post-judgment motions, the trial court interpreted the settlement agreement as relieving John Mark from making any further payments on the larger and more senior of the two loans, thereby placing the property in peril of foreclosure. Bodhi Mark now appeals, and we reverse. On de novo review of this issue, we conclude the court erred in its interpretation of the settlement agreement.

## BACKGROUND

John Mark and his unmarried partner Narda Vicent jointly owned an undivided parcel of real property in Mendocino County, held in trust. When Narda died in 2001, her fifty percent interest in the property passed in trust to their two sons, Bodhi Mark (Bodhi) and Mabin Mark (Mabin), and to her oldest son and their half-brother, James Smykla (James).

In 2015, James initiated proceedings against John over their late mother's trust for breach of fiduciary duty and to compel an accounting. The central allegations were that rather than distributing their mother's one-half interest in the real property to her sons as her trust beneficiaries, John had engaged in a series of acts of self-dealing by which he had deeded the entire property to himself, borrowed against the property, and then used the borrowed funds to engage in a construction venture in Southern California. The two other brothers, Mark and Mabin, subsequently joined in the case, and on March 30, 2017, all four parties reached a written settlement in the midst of trial.

The undisputed extrinsic evidence established that, at the time of the settlement, the property was encumbered by two deeds of trust securing approximately $750,000 of indebtedness: a $550,000 mortgage referred to by the parties in the settlement agreement as the "First Mortgage," and a $200,000 mortgage referred to as the "Second Mortgage." The former was the

2

approximate balance of a $650,000 loan John had obtained in his own name from CitiMortgage in March 2007, and the latter was a $200,000 home equity line of credit he had secured in his own name from Redwood Credit Union in May 2007.

Under the settlement agreement, two of the children, James and Mabin, cashed out of the property, each for $110,000. James agreed to sell his entire interest in the property to Bodhi, partially payable by a five-year $90,000 promissory note secured by a deed of trust against the property, subject to the two senior lienholders. Mabin agreed to sell his interest to John, partially payable by a $100,000 promissory note secured by a deed of trust against the property, junior to all of the other lienholders including James. The result was that Bodhi would own approximately an undivided 31.4 percent interest in the property and John would own approximately an undivided 68.6 percent interest.

The settlement agreement addressed many subjects concerning the property on a prospective basis. As relevant here, Bodhi and John agreed to negotiate and cooperate in good faith to accomplish a subdivision of the property into two parcels, and the settlement agreement gave each the right to buy out part of the other's interest in the property in the event of a subdivision, with the goal of allowing Bodhi to solely own the northern parcel and John the southern parcel upon the subdivision's completion.

The settlement agreement gave Bodhi and John the exclusive rights of use and possession of the northern and southern parcels, respectively, in the meantime. The agreement reflects that Bodhi had been living in a "duplex" located on John's southern parcel, which Bodhi agreed to vacate in 90 days. It also reflects that located on Bodhi's northern parcel was a three-bedroom

3

residence that presently had rental tenants, and the settling parties agreed the lease would not be renewed at its expiration.

Section 12 of the settlement agreement waived John's and Bodhi's rights of partition for four years, and provided that at the expiration of the four-year period each had a right of first refusal "of any offer made" by the other, and further specified that if "the parties do not agree on a price, an agent under limited power of attorney . . . chosen by agreement between [them] from the list attached here as Exhibit 'M' will cause the Property to be listed and sold to the highest and best bidder."

Section 5 addressed the existing mortgages. It stated in relevant part:

"A.    Payment of First Mortgage. Commencing upon the Effective Date and continuing for a period of four (4) years (the 'Co-tenancy Period'), John agrees to assume all obligations under that certain encumbrance with a balance at present of approximately $550,000.00 payable to Select Portfolio Savings . . . (the 'First Mortgage'), which loan is secured in first position by the Property. John personally warrants and guarantees that all payments on the First Mortgage will be made in a timely manner and that [his payments] . . . will at no time be in arrears. John is solely responsible for this encumbrance.

"B.    Payment of Second Mortgage. During the Co-tenancy Period, Bodhi agrees to pay fifty percent of the monthly payments due on that certain Redwood Credit Union loan . . . (the 'Second Mortgage'), or $700 a month, whichever is less. The Second Mortgage is secured by the Property in second position. Bodhi personally warrants and guarantees that all payments will be made in a timely manner, and that his payments will at no time be in arrears.

4

"Notwithstanding the foregoing, John agrees to reduce such amount of current principal on the Second Mortgage charged against it by John on or after March 8, 2017 within thirty (30) days of the Effective Date.

"In the event the Second Mortgage is not paid in full at the end of the Co-tenancy period, Bodhi agrees to continue to pay his portion until the mortgage is fully retired."

The settlement agreement provided that the action would be dismissed but that the court would retain jurisdiction to enforce it pursuant to Code of Civil Procedure section 664.6.

The court subsequently dismissed the case with prejudice (on April 3, 2017) but, as agreed by the settling parties, retained jurisdiction to enforce the settlement agreement.

On August 3, 2021, four years and three months after the parties entered into the settlement agreement, John filed a motion to enforce it. He contended that Bodhi had breached the settlement agreement by refusing to cooperate in listing the property for sale after the four-year co-tenancy period ended on March 30, 2021, and sought an order of specific performance directing Bodhi to cooperate in the viewing, showing, listing and sale of the property. He also contended that he and Bodhi disputed the meaning of section 5 of the settlement agreement, with John taking the position he was no longer required to pay the First Mortgage because the four-year co-tenancy period had expired and Bodhi taking the position John remained solely responsible to pay that mortgage. John asserted that Bodhi was using that dispute as a basis to delay or prevent a sale of the property, and asked the court to sever the First Mortgage provision from the contract pursuant to a severability clause contained in section 16 of the settlement agreement. He asserted that once that clause was deleted, "the remaining balance of the

5

First Mortgage must be paid in accordance with the parties' respective ownership interests," citing to a portion of section 12 of the settlement agreement.[1]

Bodhi, who wanted either to buy his father's interest in the property or subdivide the property and own just a portion, opposed the motion and filed a dueling motion of his own to enforce the settlement.[2] As relevant here, he sought an order confirming that he has no responsibility for the First Mortgage or, in the alternative, a finding that there was a lack of meeting of the minds and an order vacating the settlement agreement and setting case for trial.

The fundamental disagreement below was whether John was required to pay 100 percent of the remaining balance of the First Mortgage or whether Bodhi was required to pay a portion of the balance, based on his fractional ownership interest. And while the motions were pending, John allowed the property to go into default.

In a December 3, 2021 minute order, the court ruled in pertinent part

---

[1] In relevant part, section 12 states: "In the event of a sale or partition, all net proceeds will be split between Bodhi and John based on their fractional ownership interests and both parties will waive any claims for reimbursement or any contribution made, even if paid after the Effective Date, including without limitation any claim based on reduction of principal of encumbrances, sweat equity, maintenance, improvements or the like."

[2] Bodhi was in the process of trying to get approval from local planning officials to subdivide the property. One set of issues in the dueling motions to enforce the settlement agreement concerned Bodhi's contention his father was sabotaging that process by opposing his subdivision application, and a dispute as to whether the settlement agreement imposed a four-year deadline to complete any subdivision. Bodhi asserted it did not (John disagreed) and asserted John should be ordered to cooperate with his subdivision application. The subdivision dispute is not at issue in this appeal.

that "[t]he four-year term set forth in the Agreement expired on March 30, 2021," "to date, [John] has stopped making any mortgage payments," and that "pursuant to the agreement either party may make an offer to purchase the property in its entirety, or the property is to be listed for sale" but that "[n]either party has made an offer to purchase so the property must be listed for sale." It also ruled that John "will no longer be responsible for the mortgage payments."

Bodhi then timely appealed the court's order.[3]

## DISCUSSION

Bodhi raises two issues. He argues the court erred in absolving John of responsibility for the First Mortgage under section 5 of the settlement agreement. He also argues in the alternative that the order is void, because James and Mabin were indispensable parties yet they were not served with the motion papers nor appeared at the hearing or filed any papers in connection with the motions. We do not reach the second issue, because we agree with the first.[4]

Both parties agree that resolution of the First Mortgage issue is a question of contractual interpretation, and presents a binary choice. Bodhi argues that under the principles of contractual interpretation, the language

---

[3] Neither party has addressed the issue, but we must consider whether the trial court's order is an appealable judgment. While the trial court's order granting John's motion and denying Bodhi's motion does not use the term "judgment," its effect was "to finally determine the rights of the parties in this action by enforcing the settlement agreement." (*Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1252.) We therefore "will amend the order to include an appealable judgment so as to expedite appellate review." (*Ibid*.)

[4] Bodhi filed a request for judicial notice on November 10, 2022 in connection with the indispensable party issue, which John opposed and we previously took under submission. We now deny that motion as moot.

7

of settlement agreement must be interpreted as meaning that payment of the First Mortgage is solely John's responsibility. John argues that he was not obligated to pay the First Mortgage "for all time" but only during the four-year co-tenancy period.

We review this question de novo, because the extrinsic evidence (of which there is very little) was not in conflict.[5] "It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations] or a determination has been made upon incompetent evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

---

[5] John asserts "[c]onflicting evidence was submitted . . . in the form of declarations submitted to the court." But he provides no record citations for that assertion and, moreover, we have reviewed the declarations submitted in connection with the cross-motions and disagree. We discuss the extrinsic evidence below. Equally without merit is his suggestion that the trial court's familiarity with the case and recollection of having encouraged the settlement negotiations is conflicting evidence that supports his interpretation of the settlement agreement's meaning. He cites the trial court's comment that "I was involved in trying to get this case settled" and the court's recollection that "Bodhi really wanted to stay on the property and John wanted out as much as possible." But the court's recollection of the parties' ultimate objectives is not in conflict with any of the extrinsic evidence. Furthermore, as Bodhi points out, nothing in the record indicates the trial court presided over the negotiations that yielded the written agreement that was ultimately signed or that the court even saw the settlement agreement until four years later when it was asked to enforce it. The register of actions reflects only that the trial recessed and a few days a later a request for dismissal was filed. The register of actions does not indicate that a judicially supervised settlement negotiations took place during that recess.

We begin with the principles of contractual interpretation. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) In interpretating a contract, "[o]ur initial inquiry is confined to the writing alone." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752 (*Mountain Air*); Civ. Code, § 1639.) Judicial interpretation is controlled by " ' "[t]he 'clear and explicit' meaning" ' " of words, " ' "interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.' " ' " (*Mountain Air*, at p. 752; Civ. Code, §§ 1638, 1644.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) Moreover, " 'a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates. (Civ. Code, § 1647).' " (*Mountain Air*, at p. 752.) " 'Extrinsic or parol evidence may be used to explain ambiguity, context or related matter.' " (*Hollingsworth v. Heavy Transport, Inc.* (2021) 66 Cal.App.5th 1157, 1177.) Moreover, " '[i]f a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect.' " (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 953–954; Civ. Code, § 1643.)

As noted, the disputed language states:

"A. <u>Payment of First Mortgage</u>. Commencing upon the Effective Date and continuing for a period of four (4) years (the 'Co-tenancy Period'), John agrees to assume all obligations under that certain encumbrance with a balance at present of approximately $550,000.00 payable to Select Portfolio Savings . . . (the 'First Mortgage'), which loan is secured in first position by

9

the Property. John personally warrants and guarantees that all payments on the First Mortgage will be made in a timely manner and that [his payments] . . . will at no time be in arrears. John is solely responsible for this encumbrance."

This language is ambiguous. It does not expressly address whether John is responsible for the First Mortgage after expiration of the four-year period, and both parties posit differing interpretations of this provision.

The parties introduced very little extrinsic evidence about its meaning. Bodhi stated in a declaration that at the time he signed the settlement agreement, "I understood that I would have no responsibility for the First Mortgage." But that evidence is incompetent.[6] Bodhi's lawyer stated in a declaration that during settlement negotiations John "express[ed] a willingness to make concessions on the mortgages" to accomplish the goal of John keeping the property by cashing Bodhi out for an in-kind distribution. Bodhi corroborated this, stating in a declaration that "my father expressed that he was willing to make substantial concessions in handling the mortgages . . . if I would be willing to take an in-kind distribution." Bodhi also introduced undisputed evidence, through his lawyer, that the final sentence of the First Mortgage clause stating that "John is solely responsible for this encumbrance" was added at the last minute during the settlement negotiations.

---

[6] California law follows the objective theory of contracts. (See 1 Witkin, Summary of Cal. Law (11th ed. 2021 update) Contracts § 767; *Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 916.) Thus, " ' "[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation." ' " (*Zissler v. Saville* (2018) 29 Cal.App.5th 630, 644.)

There also is undisputed extrinsic evidence of the circumstances in which the settlement was made. Bodhi introduced copies of three deeds evidencing that John had conveyed the trust property to himself in full (rather than to the heirs) and then conveyed security interests in the property to two lenders to secure loans to himself in principal amounts totaling $850,000. John introduced no conflicting evidence nor, indeed, any extrinsic evidence about the circumstances of those transactions.

Considering the language of section 5 in context of the entire agreement, the parties' purpose, and the surrounding circumstances, section 5 does not mean that John has no obligation to pay the First Mortgage after four years. That is an unreasonable construction.

Turning, first, to the "writing alone" (*Mountain Air*, *supra*, 3 Cal.5th at p. 752), Bodhi argues that both the text and structure of section 5 indicates that John's obligation to pay the First Mortgage is not time-limited. He acknowledges, as do we, that at first blush there is superficial appeal to John's contrary interpretation, because in the first sentence, John expressly agreed to "assume" all obligations under the First Mortgage "[c]ommencing upon the Effective Date and continuing for a period of four (4) years (the 'Co-Tenancy Period')." But, Bodhi points out that the final sentence stating that "John is solely responsible for this encumbrance" is unqualified, was added later in time and contains no time restriction. He also points out that the language addressing payment of the Second Mortgage (1) addresses time periods beyond the four-year co-tenancy period, which reflects the parties understood the property might not be sold within four years; and (2) is silent as to who is responsible for paying the portion of the *Second Mortgage* Bodhi did not agree to pay. He argues that even if the property were listed for sale at the end of the four-year co-tenancy period, any reasonable drafter would

11

have recognized there could be a time delay in actually selling it, and that both mortgages would need to be paid in the meantime. He argues that, just as the parties understood and implicitly agreed that John would continue to pay that portion of the Second Mortgage Bodhi was not paying (both during and beyond the four year co-tenancy period) even though the contract does not expressly say so, so too did they understand and agree that John remained obligated to pay that portion of the First Mortgage Bodhi did not expressly agree to pay (i.e., all of it). Put another way, he asserts that silence as to who is responsible for paying that portion of the First Mortgage that Bodhi did not expressly agree to pay should be construed as an implied agreement that it remains John's obligation. "The obligation was, after all, in John's name."

We agree. The evidence is undisputed that John, and John alone, is the borrower who is contractually obligated on the two mortgages. Section 5 thus reflects a contractual agreement between two parties about how to satisfy one of the parties' debts. It does not, and could not, relieve the debtor (John) of his obligations *to the lender*.

John asserts that "the agreement does not specifically address who should pay the first mortgage after the four-year period because there was no need," because it was "agreed that the property would be sold at that time." The trial court found that a sale was required at the end of four years, and nobody has challenged that ruling on appeal. It thus is not before us. But John's assumption the parties contemplated that the property would be sold *immediately* at the end of four years is refuted by the parties' express agreement that Bodhi should continue paying *the Second Mortgage* after the four-year period expired, and the commercial realities just discussed.

12

Moreover, we do not agree with John that the prospect of a sale at the end of four years means the parties agreed to relieve him of the obligation to pay the First Mortgage. John's interpretation of the contract is not reasonable because it would lead to results that are both absurd *and* inequitable. (See *West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1185 ["the court 'should avoid an interpretation which will make the contract unusual, extraordinary, harsh, unjust or inequitable . . ., or which would result in an absurdity' "].) To begin with, it is implausible that the parties would have mutually agreed (at a minimum) to allow John to stop making payments on the First Mortgage and place the property in default; certainly, Bodhi had no incentive to allow that to happen—he was trying to get the property subdivided. Indeed, John agrees the First Mortgage provision must be construed in the manner in which John believed *Bodhi* would have understood it. (See Civ. Code, § 1649.) Bodhi would have had no reason to give his father a green light to stop paying the mortgage after four years, which would mean essentially walking away from the property and leaving it to the senior creditor, when the entire structure and purpose of the settlement agreement was to facilitate either a subdivision that would enable them both to continue to own part of the property or, barring that, a private sale on the open market. Such a construction would render other provisions of the settlement agreement incapable of being carried out—namely, the provisions calling for either its subdivision or sale—because if John stopped paying the First Mortgage after four years, the lender would have the right to step in and foreclose on its security. " '[E]ven if one provision of a contract is clear and explicit, it does not follow that that portion alone must govern its interpretation; the whole of the contract must be taken together so as to give effect to every part.' ' "

13

(*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 799; accord, *Legendary Investors Group No. 1, LLC v. Niemann* (2014) 224 Cal.App.4th 1407, 1413 [rejecting interpretation of isolated sentence in debt instrument that would render other provisions incapable of being given effect]; Civ. Code, § 1650 ["Particular clauses of a contract are subordinate to its general intent"].)

Equally illogical and inequitable on this record is the idea that Bodhi agreed to assume any responsibility for helping his father retire a $650,000 loan John had taken out for his own personal use. Bodhi explained in a declaration that it was alleged John had obtained the financing for a development project John was undertaking in Southern California. John neither denied nor purported to explain this evidence of the allegations in the complaint, and it is undisputed evidence of the context in which the settlement agreement was made. There is no evidence to suggest or imply that John somehow reinvested any portion of the borrowed funds back into the trust property or that the heirs in any way benefited from those funds.

There is no evidence whatsoever—neither in the language of the settlement agreement nor in the extrinsic evidence—that Bodhi agreed to help John retire that debt *ever*, including out of Bodhi's proportionate distribution from any sale proceeds if the property were eventually sold rather than subdivided. Bodhi clearly agreed to assume limited responsibility for paying down the smaller, Second Mortgage including after the four-year period. But that is explicit in the language of the settlement agreement: he agreed to pay up to $700/month toward that debt. And we can reasonably infer from the undisputed evidence that he agreed to do that because for some period prior to the dispute, he had lived on the property and would live on it once the leasehold on the part of the property allocated to

14

him expired. But to assume that he agreed to take any responsibility for funding the payoff of his father's massive indebtedness on the First Mortgage when (a) the settlement agreement does not explicitly say that, (b) it explicitly says the opposite ("John is solely responsible for this encumbrance"), and (c) John has sole legal responsibility to the lender is an enormous leap. To limit John's responsibility for his personal borrowing when there is no evidence his sons benefitted from it and he encumbered the property only in acts of alleged self-dealing would be inequitable.

John argues an agreement that Bodhi would contribute toward the First Mortgage after four years is implicit in section 12 of the settlement agreement, which addresses how net proceeds from a sale would be divided. In relevant part it states: "In the event of a sale, all net proceeds will be split between Bodhi and John solely based on their fractional ownership interests and both parties will waive any claims for reimbursement or any contribution made, even if paid after the Effective Date, including without limitation any claims based on reduction of principal encumbrances, sweat equity, maintenance, improvements or the like." John asserts that under this provision, "at the time of the sale . . . , all liens and mortgages [would be] paid 'off the top' prior to a distribution to the parties of their respective proportional interests of the net proceeds," because "net" proceeds are calculated by deducting from the gross sale price expenses including payment of outstanding mortgages or other liens.

We do not agree. John offers no extrinsic evidence to support that construction of the phrase "net proceeds," which is unreasonable when considered in light of the language, purpose, and circumstances of this settlement agreement. To infer an intent that Bodhi agreed to retire the debt incurred by his father for personal use unrelated to the property after four

15

years, we require language more clear and explicit that an isolated phrase buried in a different section of the settlement agreement addressing a different subject. We cannot reasonably infer the parties intended to address that subject so vaguely and indirectly—particularly when it is undisputed Bodhi's lawyer went to the trouble at the last minute of adding express language to the more *directly* applicable section of the settlement agreement (i.e., section 5) stating that "John is solely responsible for this encumbrance."

Moreover, far from supporting John's interpretation, section 12 states the parties "waive" any claims for reimbursement based upon reducing encumbrances after the agreement's effective date (i.e., the mortgages). This reflects that both parties contemplated that the mortgages would continue to be paid after the effective date *and* that the party who paid them would have no recourse against the other for reimbursement. Since only John was legally obligated *to the lenders* to continue paying the mortgages, this clause prevented him from seeking reimbursement from Bodhi. Bodhi had no legal obligation to the lenders to pay anything, and thus would have had no reason to make a reimbursement claim against John. Thus, the waiver of reimbursement claims language further reflects the parties' understanding and agreement that John was required to make all mortgage payments other than those Bodhi expressly agreed to assume under section 5 (i.e., a portion of the Second Mortgage).

Finally, John's interpretation is in conflict with the undisputed evidence Bodhi introduced that John communicated his willingness to make substantial concessions on the mortgages during the settlement negotiations. The reasonable inference is that he did so, agreeing to continue paying his obligations under the First Mortgage and avoid a default, in order to

16

facilitate the parties' goals regarding ultimate disposition of the property after the conclusion of the four-year co-tenancy period.

We infer that the parties specified expressly that John remained obligated to pay the First Mortgage during the four-year co-tenancy period solely to leave no room for doubt about that, because Bodhi agreed to contribute only toward the Second Mortgage unless and until the property were sold or subdivided. The provision making explicit John's obligation to pay the First Mortgage also bound him to pay the mortgage on a timely basis, furthering the goal of maintaining the settling parties' possession of the property in order to subdivide or sell it. Section 5 was not intended to *limit* John's obligation to pay the First Mortgage to only four years. The trial court erred in concluding that it was.

## DISPOSITION

The December 3, 2021 order is reversed and the matter is remanded with instructions for the trial court to enter a new and different order declaring that John is solely responsible for payment of the First Mortgage, directing him to pay the arrears on the First Mortgage and directing him to continue to timely pay the First Mortgage unless and until the property is sold. In all other respects the December 3, 2021 is affirmed. Appellant shall recover his costs.

STEWART, P. J.

WE CONCUR:

RICHMAN, J.
MARKMAN, J.*

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.